2009 ME 72

**STATE of Maine**

v.

**Rory C. HOLLAND.**

Supreme Judicial Court of Maine.

Submitted on Briefs: April 30, 2009.

Decided: July 21, 2009.

Thomas J. Connolly, Esq., Portland, ME, for Rory Holland.

Mark W. Lawrence, Dist. Atty., John M. Pluto, Asst. Dist. Atty., Anne Marie Pazar, Contract Brief Writer, Alfred, ME, for State of Maine.

Panel: CLIFFORD, and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] Rory C. Holland appeals from the judgment of conviction of one count of criminal mischief (Class D), 17–A M.R.S. § 806(1)(A) (2008), entered in the Superior Court (Androscoggin County, *Delahanty, J.*) following a jury trial. Holland argues that the court erred when it: (1) denied his challenge to the lack of racial diversity in his jury pool; (2) denied his challenge to certain jurors for cause; and (3) denied his request for a jury instruction on the competing harms defense pursuant to 17–A

M.R.S. § 103 (2008).[1] We affirm the judgment.

## I.  CASE HISTORY

### A.  Events Leading to the Indictment

[¶ 2]  The basic facts of the case are not in dispute.  The jury could reasonably have found the following facts, viewing them in a light most favorable to Holland. *See State v. Nadeau*, 2007 ME 57, ¶ 9 n. 1, 920 A.2d 452, 454 (stating that when determining whether there was evidence on each element of a competing harms defense sufficient to submit the defense to the fact-finder, we review the evidence in a light most favorable to the defendant).

[¶ 3]  Holland owned and lived in a small multi-unit building in Biddeford. Between Holland's property and a neighbor's home was a line of six poplar trees that, in 2005, were approximately sixty feet tall and encroached upon Holland's property.  Holland and his neighbor had disputed, but not resolved, the location of their boundary line in relation to the poplar trees.  Power lines to Holland's home run parallel to the line of poplars along Holland's side of the poplars.

[¶ 4]  On September 22, 2005, Holland cut four of the six trees, causing three of those four trees to fall over.  One of the felled trees landed on his neighbor's car and destroyed it.  The power lines running from the street to Holland's home were not damaged.

[¶ 5]  On September 26, 2005, the neighbor saw Holland standing next to the remaining two poplars holding a power saw, after which she discovered deep cuts to those two trees.  A tree company took down the two damaged trees later that day.  Holland did not dispute that he cut the trees, including the one that damaged the neighbor's car, asserting that he acted to avoid damage to his home and the power lines to his home.

[¶ 6]  Holland was indicted by the York County Grand Jury on one count of aggravated criminal mischief (Class C), 17–A M.R.S. § 805(1)(A) (2005), for intentionally, knowingly, or recklessly damaging his neighbor's car.[2]

### B.  Challenge to the Jury Pool and Voir Dire

[¶ 7]  Holland is African–American.  On February 24, 2006, he filed motions challenging the racial composition of the York County jury pool and requesting State funds to conduct a jury pool study.  On March 1, 2006, the day of his arraignment, Holland filed a motion to change venue. After changes of court-appointed counsel and several continuances, the court (*Bradford, J.*): (1) granted Holland's motion for a change of venue;  (2) transferred the case for trial to Androscoggin County;  and (3) granted Holland $750 to conduct a jury pool study.

[¶ 8]  Holland subsequently filed a motion challenging the jury pool in Androscoggin County and a motion requesting State funds for a jury pool expert.  Holland's counsel also filed a motion to with-

---

1.  Title 17–A M.R.S. § 103(1) (2008) provides, in part:

    1.  Conduct that the person believes to be necessary to avoid imminent physical harm to that person or another is justifiable if the desirability and urgency of avoiding such harm outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the statute defining the crime charged....
    Title 17–A M.R.S. § 103 (2005) was amended without substantive changes by P.L. 2007, ch. 173, § 18 (effective Sept. 20, 2007).

2.  Title 17–A M.R.S. § 805(1)(A) has since been amended by P.L. 2005, ch. 660, § 1 (effective Aug. 23, 2006).

draw. Holland's motion challenging the jury pool asserted that the jury selection process was not race-neutral, that it systemically resulted in underrepresentation of African Americans, and accordingly, violated his constitutional rights under the Sixth Amendment and the Equal Protection Clause.

[¶ 9] The Superior Court (*Delahanty, J.*) held a hearing on the motions. The court denied counsel's motion to withdraw. The court also concluded that the challenge to the jury panel for Androscoggin County was premature. The court denied additional funds for an expert based on Holland's failure to show grounds, the expert methodology, and basis for the expert's charges. The court noted that it had previously approved $750 for a study, and that there was no sufficient showing that those funds had been used or were inadequate.

[¶ 10] Jury selection was conducted on May 19, 2008. At Holland's request, the court gave the prospective jurors a written questionnaire containing eighteen questions intended to examine the potential jurors' feelings about and experiences concerning African–Americans and other minorities. The questions asked included whether the potential juror feels nervous, anxious, or intimidated alone in the presence of a black male; feels uncomfortable around black people; has lived with or has a close friendship with a black person; and, if the juror answered yes to any of the eighteen questions, whether the juror's feelings make it difficult for him or her to be fair and impartial. Of the eighty-one venire persons, seventeen responded affirmatively to one or more of the questions and also responded that their feelings would make it difficult for them to be fair and impartial jurors. The court excused each of those seventeen jurors. Forty-five additional jurors responded affirmatively to one or more of the additional questions, most stating they had lived with or had a close friendship with an African–American, but also stating that their ability to be fair and impartial would not be impaired.

[¶ 11] Based on the written answers, the court excused for cause several additional prospective jurors. Holland objected to twelve other potential jurors who stated that: (1) they felt intimidated by and uncomfortable around African–Americans; (2) they or someone in their family had used a particular racial epithet; or (3) both; but (4) they thought they could be fair and impartial. After other voir dire was conducted, the court granted Holland's challenges for cause as to jurors based on their having admitted to using, or having family members who used, the racial epithet. This left four potential jurors in the venire pool who had stated that they felt uncomfortable or intimidated around African–Americans, but that they could be fair and impartial. The court did not ask, and Holland did not request, although invited to do so, further questions of the challenged jurors concerning their feelings about race.

[¶ 12] Of the four remaining potential jurors whom Holland had challenged for cause, one was struck by the State's exercise of a peremptory challenge. Holland did not use his eight peremptory challenges to strike any of the remaining three challenged jurors. Two of the three challenged jurors were impaneled.

[¶ 13] Holland then objected to the jury based on lack of racial diversity. Holland argued that, based on his observations, the assembled jury pool contained no racial minorities. The court and State both agreed with this observation. Holland made an offer of proof that the panel was assembled pursuant to the "normal protocol that the clerk's office uses," and that it is "typical to the racial outcome that

they are expected and normally do see in this county, that nothing untoward or unusual was done in reference to this selection process, and this is consistent with the way things have been done for at least ... the last five years or longer...." The court clarified, "By that you're talking about the so-called master plan that exists and the process of obtaining the names from the Secretary of State's office," to which Holland agreed.[3]

[¶ 14] The court stated that the clerk had compiled some information at the court's request, i.e., that 151 people total were summonsed of which twenty-five were excused for medical reasons, nineteen were deferred for work or financial reasons, eleven failed to appear, and there were four whose mail was returned for improper address and the like. Of the remaining ninety-two potential jurors, two called in sick on the day of jury selection. The court believed eighty-one potential jurors actually appeared for Holland's jury selection. The court noted that it had no way of knowing the race of the potential jurors who did not appear for jury duty because the questionnaires sent to prospective jurors do not request racial information. The court also observed, based on the sitting justice's personal experience, that minorities have been in the jury pool and have sat on juries in Androscoggin County over the last twenty-five years, but that the court had no actual figures and "would not guess."

[¶ 15] Holland requested that the court take judicial notice of census data from Androscoggin County stating that the ra-

cial composition of the county for the year 2000, the most recent statistics then available, was 97% White, 0.7% Black, 0.3% Native American, 0.6% Asian, and .3% other, and that 1% of the population was described as Hispanic. The census data also shows that 1.2% of the county's 2000 population represented more than one race. Holland acknowledged that the racial data included all persons in the county in 2000 regardless of age, citizenship status, or eligibility for jury duty.

[¶ 16] Holland concluded by arguing that the venire pool, and thus the jurors that ultimately participated in the voir dire, "were not a fair and equal representative of the community" in which Holland was to be tried, that the jury pool selected was based on an unfair selection process, and he was denied equal protection and due process. Holland requested that the court either change venue to a locale where the "probability of a representative sample is higher, such as Portland"; convene a separate panel for which the court would affirmatively seek out racial minorities to serve as jurors; or provide a different mechanism of selection that would increase the number of racial minorities in the jury pool. Finding no evidence to support Holland's assertion that minorities were systematically excluded from the jury pool, the court denied Holland's objection to the jury.

## C. Trial and Post–Trial Proceedings

[¶ 17] A three-day trial was held on May 19 through 21, 2008. Before the case went to the jury, Holland requested that

---

**3.** Persons called for jury duty in Maine are randomly selected by computer from driver's license and State identification card lists with the addition of persons who do not have licenses but who wish to volunteer for jury service. 14 M.R.S. § 1252–A (2008); Alexander, *Maine Jury Instruction Manual* § 1–1 (4th ed. 2009). The lists of those to be sum-

monsed are prepared by the Division of Motor Vehicles' computer in the Secretary of State's Office and are submitted to the clerks in each county. *Maine Jury Instruction Manual* § 1–1. The clerk then mails prospective jurors questionnaires that are to be completed and returned. 14 M.R.S. § 1254–A (2008); *see also Maine Jury Instruction Manual* § 1–1.

the court give the jury an instruction on the competing harms defense. The court denied the request. Holland also moved for a judgment of acquittal, which the court granted to the extent that it determined that the evidence did not support a conclusion that Holland intentionally or knowingly committed aggravated criminal mischief. The court concluded that the State had offered sufficient evidence to support a finding that Holland recklessly committed that crime.

[¶ 18] The jury acquitted Holland of aggravated criminal mischief, but convicted him of the lesser included offense of criminal mischief (Class D), 17–A M.R.S. § 806(1)(A).

[¶ 19] Venue was returned to York County for post-trial proceedings. After again objecting to the racial composition of the jury panel, Holland was sentenced on May 30, 2008, to seven months in York County jail, all but two months suspended, execution of which was stayed pending appeal, and payment of $1000 in restitution.

[¶ 20] In an order entered June 13, 2008, the court denied Holland's motion to dismiss based on the composition of the Androscoggin County traverse jury and the jury selection process.[4] Holland brought this appeal.

## II. LEGAL ANALYSIS

### A. Representativeness of the Jury Pool

#### 1. Sixth Amendment Analysis

[¶ 21] Holland argues that he was denied his right to a jury drawn from a fair cross-section of the community, as is required by the Sixth Amendment. He argues that he established a prima facie case showing that African–Americans, a distinctive group for purposes of Sixth Amendment fair-cross-section claims, were systematically excluded from the jury pool. He also argues that the court erred in failing to consider his offer of proof that the absence of African–Americans from the Androscoggin County jury pool was consistent with other jury pools generated in the county, which he argues demonstrates systematic exclusion. Finally, Holland argues that the court erred in taking judicial notice of facts not in evidence concerning the presence or absence of African–Americans on Androscoggin County jury panels.

[¶ 22] The Sixth Amendment, made applicable to the states by the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right to a ... trial[ ] by an impartial jury of the State and district wherein the crime shall have been committed...." U.S. Const. amend. VI. The United States Supreme Court has stated that "the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community.... [I]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (quotation marks omitted). The requirement of a fair cross-section does not, however, guarantee that juries be "of any particular composition." *Id.* at 538, 95 S.Ct. 692. All that is required is that "the jury wheels, pools of names, panels, or venires from which juries are drawn must

---

4. In denying the motion, the court reviewed the 2000 census data that had been previously admitted as Defense Exhibit A, but conducted its own research, looking up information from 2006 as well. The court also denied Holland's motion to dismiss based upon the racial composition of the York County Grand Jury, which Holland does not challenge on appeal.

not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.*; *see also Christian v. State,* 268 A.2d 620, 624 (Me.1970).

■ [¶ 23] To establish a prima facie claim that a jury selection process violates the constitutional requirement that the jury be selected from a pool representative of the community at large, the challenging party has the burden to show that: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in jury pools from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process.[5] *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

### a. The First *Duren* Element

■ [¶ 24] Holland correctly contends that African–Americans are a distinctive group for purposes of this analysis. Thus, the first *Duren* element is met. *See United States v. Royal,* 174 F.3d 1, 6 (1st Cir.1999) (citing *United States v. Hafen,* 726 F.2d 21, 23 (1st Cir.1984) (citing *Peters*

*v. Kiff,* 407 U.S. 493, 498–99, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972))).

### b. The Second *Duren* Element

[¶ 25] The second *Duren* element requires Holland to show that the representation of African–Americans (Holland refers to all minorities in arguing the second *Duren* element, not just to African–Americans as he had in the first element)[6] in panels from which juries are selected in Androscoggin County is not fair and reasonable in relation to the number of such persons in the community. Courts have discussed various forms of statistical analysis that may be used to establish the second *Duren* element. We have not previously addressed these methods of statistical analysis. *See State v. Anaya,* 456 A.2d 1255, 1259–61 (Me.1983) (holding that the defendant failed to satisfy the first element of the *Duren* test, obviating the need to consider the latter two elements).

[¶ 26] Holland mentions three analytical methods courts have adopted, noting that most have applied the "absolute disparity test." He urges us not to adopt that test, however, and appears to suggest that we instead apply the approach taken in *United States v. Osorio,* 801 F.Supp. 966, 977–78 (D.Conn.1992) (applying, then rejecting the results of, the "absolute numbers" test adopted in the Second Circuit).[7]

---

**5.** If a prima facie case is established, the government may nonetheless overcome the inference of an improper selection process by demonstrating that those aspects of the jury selection process that would result in the disproportionate exclusion of a distinctive group, such as exemption criteria, "manifestly and primarily" advance a significant state interest. *Duren v. Missouri,* 439 U.S. 357, 367–68, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

**6.** We assume, without deciding, that "minorities" generally may be a distinctive group for purposes of this analysis. *See, e.g., United States v. Smith,* 2006 U.S. Dist. Lexis 44853, at *5 (W.D. Mich. June 29, 2006) ("Although a group defined by what it is not, i.e., non-

white, does not have the commonality of attitudes, ideas or experiences that may be shared by a single race or culture, they may share some commonality in their experiences as racial minorities.").

**7.** The "absolute numbers" test requires a court to first calculate "the difference between a group's proportion of the population and its proportion in the relevant jury pool," then multiply that percentage difference "by the size of a typical venire in order to determine the number of individuals from the distinctive group that have to be added to the venire to account for the group's underrepresentation." *United States v. Osorio,* 801 F.Supp. 966, 977 (D.Conn.1992). In *Osorio,*

[¶ 27] Although the United States Supreme Court has not mandated the use of any particular test, the Court considered only the absolute disparity test in *Duren* to determine whether the distinctive group at issue was underrepresented in venire panels. *Duren*, 439 U.S. at 365–66, 99 S.Ct. 664; *see also Royal*, 174 F.3d at 8. The First Circuit has consistently applied the absolute disparity test over the comparative disparity test in such cases.[8] *See Royal*, 174 F.3d at 7–8 (describing the comparative disparity test and its historical rejection thereof); *Hafen*, 726 F.2d at 23–24 (applying the absolute disparity test in the case before it, though acknowledging that the complete exclusion of a small distinctive group will result in only a small absolute disparity).

■ [¶ 28] The absolute disparity test measures the difference between the percentage of members of the distinctive group in the community and the percentage of group members on the jury wheel, though the test has often been applied by measuring the difference between the percentage of members of the distinctive group in the community who are eligible for jury duty, at least with respect to age, and the percentage of group members on the jury wheel. *See, e.g., Duren*, 439 U.S. at 364–66, 99 S.Ct. 664 (comparing the percentage of the distinctive group in jury venires to the percentage of the group, women, in the community); *Royal*, 174 F.3d at 6–7, 10 (comparing the percentage of black persons eighteen years or older in the community to the percentage on the jury wheel); *United States v. Pion*, 25 F.3d 18, 23 n. 5 (1st Cir.1994) (defining the absolute disparity standard as "the gross spread between the percentage of eligible Hispanics ... in the relevant population and the percentage of Hispanic representation on the Master Jury Wheel"); *Hafen*, 726 F.2d at 23 (calculating "the difference between the percentage of eligible blacks

the court acknowledged that, applying the absolute numbers test, the result was, under Second Circuit precedent, citing *United States v. Biaggi*, 909 F.2d 662 (2d Cir.1990), insignificant, indicating no Sixth Amendment violation. *Osorio*, 801 F.Supp. at 978. However, distinguishing the case from *Biaggi*, the District Court held that a Sixth Amendment violation had occurred. *Id.* at 978–79. The court stated that, whereas any underrepresentation in *Biaggi* resulted by chance from the benign use of voter registration lists to develop a venire, in *Osorio*, the underrepresentation, though numerically minimal, resulted from non-benign circumstances in which the two largest cities in the division containing large minority populations, as well as numerous towns, were inadvertently excluded from the qualified wheel. *Id.* at 978–79.

Holland seems to suggest that we follow *Osorio* in rejecting the application of tests that produce small numbers. However, the reasoning behind the decision to do so in *Osorio*, the inadvertent exclusion of large cities containing large minority populations and numerous towns in the district, is not present in this case. Holland has shown no misapplication of the State's usual procedure in develop-

ing a jury pool, and in fact, stipulated at trial that the jury pool was created in accordance with State statute.

8. The First Circuit refused to employ the comparative disparity test in one case, explaining that "the smaller the group is, the more the comparative disparity figure distorts the proportional representation," noting, for example, if an area had 500,000 whites and only one black person eligible to serve as jurors, "a random selection system that failed to place the single black on the master wheel would produce a 100 per cent comparative disparity, even though an all-white jury would clearly form a 'fair cross section' of the community." *United States v. Hafen*, 726 F.2d 21, 24 (1st Cir.1984). Furthermore, "[a] small variation in the figures used to calculate comparative disparity can produce a significant difference in the result." *Id.* (declining to apply the comparative disparity test in part for this reason, and noting that "the appellees have demonstrated that there is reason to doubt the accuracy of the figures on which appellant would have us rely").

in the population [i.e., age eighteen or over] and the percentage of blacks on the master wheel").

[¶ 29] Several Courts of Appeals, including the First Circuit, have held, often citing *Swain v. Alabama*, 380 U.S. 202, 208–09, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (analyzing an equal protection claim), *overruled in part on other grounds* as explained in *Rivera v. Illinois*, —— U.S. ——, ——, 129 S.Ct. 1446, 1455, 173 L.Ed.2d 320 (2009), that an absolute disparity of less than 10% is not sufficient to demonstrate underrepresentation pursuant to the Sixth Amendment. *See, e.g., United States v. Carmichael*, 560 F.3d 1270, 1280 (11th Cir.2009) (stating that it is black-letter law in that circuit that an absolute disparity of 10% or less does not satisfy the second *Duren* element); *United States v. Gault*, 141 F.3d 1399, 1402–03 (10th Cir.1998) (absolute disparity of 7% permissible), *cert. denied*, 525 U.S. 910, 119 S.Ct. 253, 142 L.Ed.2d 208 (1998); *United States v. Joost*, 1996 U.S.App. Lexis 21959, at *21 (1st Cir. Aug. 7, 1996) (citing *Hafen*, 726 F.2d at 23) (approving an absolute disparity of 7.13% and noting that disparities up to 10% are widely considered not to constitute underrepresentation), *cert. denied*, 519 U.S. 974, 117 S.Ct. 408, 136 L.Ed.2d 321 (1996); *United States v. Ashley*, 54 F.3d 311, 314 (7th Cir.1995) (holding that a disparity of less than 10% alone is insufficient to demonstrate underrepresentation), *cert. denied*, 516 U.S. 888, 116 S.Ct. 232, 133 L.Ed.2d 161 (1995); *United States v. McAnderson*, 914 F.2d 934, 941 (7th Cir. 1990) (absolute disparity of 8% permissible); *United States v. Hawkins*, 661 F.2d 436, 442 (5th Cir.1981) (absolute disparity of 5.45% permissible), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982); *United States v. Clifford*, 640 F.2d

150, 155 (8th Cir.1981) (absolute disparity of 7.2% permissible).

[¶ 30] Though we recognize the inherent limitations of the test, as with each of the statistical tools discussed, the absolute disparity test utilized by the United States Supreme Court and the First Circuit appears to be the appropriate method for measuring representativeness in our jury pools. *See Taylor*, 419 U.S. at 538, 95 S.Ct. 692.

■ [¶ 31] At jury selection, Holland offered evidence, in the form of census statistics from 2000, *see Duren*, 439 U.S. at 365 n. 24, 99 S.Ct. 664 (indicating that six-year-old census data may be used to show a Sixth Amendment cross-section violation), that African–Americans constituted 0.7% of the total population of Androscoggin County, but that none of the eighty-one potential jurors in his jury pool appeared to be African–American. It is unknown how many African–Americans in Androscoggin County were qualified on the basis of age for jury duty. It is also unknown how many of the 151 people originally called to jury duty and who were excused or deferred from jury duty, or who failed to appear at the venire, may have been African–American. *See Pion*, 25 F.3d at 23 n. 5 (observing that the absolute disparity test properly measures the difference between the percentage of eligible members of the distinctive group and percentage on the jury wheel, not the percentage who appear for jury orientation). Therefore, applying the absolute disparity test to the extent possible by comparing the percentage of African–Americans in the community (.7%) to the percentage who were, based on mere observation, in Holland's eighty-one person jury pool (0%), the disparity is 0.7%.[9]

---

9. We recognize that, if anything, this figure is skewed in Holland's favor because it likely

includes African–Americans in Androscoggin

Though we need not necessarily adopt the 10% disparity threshold that many courts have adopted, the 0.7% disparity is not sufficient to show underrepresentation of African–Americans in Holland's jury pool.[10] *See Ashley,* 54 F.3d at 313–14 (holding that an absolute 3% discrepancy between the 3% of voting-age African–Americans in the population and the 0% of African–Americans on the jury venire was not shown to be more than statistical coincidence).[11]

c. The Third *Duren* Element

[¶ 32] Although underrepresentation in the jury pool has not been demonstrated using the absolute disparity test, we also address and apply the third *Duren* element. The third *Duren* element requires the challenging party to show that underrepresentation of the distinctive group, both generally and on the particular jury selection panel, occurred as a result of "systematic exclusion" from jury pools. *Duren,* 439 U.S. at 366, 99 S.Ct. 664. "Systematic exclusion" means exclusion "inherent in the particular jury-selection process utilized." *Id.*

[¶ 33] Holland argues with respect to the third *Duren* element that he made an offer of proof at trial that the racial composition of his jury pool is consistent with other Androscoggin County jury pools, which he contends the court should have considered. However, the issue for consideration relevant to the third *Duren* element is not racial composition of jury panels, but rather juror summonsing and selection practices and the extent to which such practices are shown to result in systemic exclusion of minorities from jury pools.

[¶ 34] There is no evidence in the record to suggest that, even if underrrepresentation had been shown, it was due to systematic exclusion of any group in jury selection processes. Maine jury selection practices are designed to ensure that no such systemic exclusion could occur. Maine statutory law provides that "all persons chosen for jury service be selected at random from the broadest feasible cross section of the population of the area served by the court [and] that all qualified citizens have the opportunity in accordance with this chapter to be considered for jury service." 14 M.R.S. § 1201–A (2008). A person may not be excluded from jury service on account of, among other things, race, color, national origin, or ancestry. 14 M.R.S. § 1202–A (2008).

[¶ 35] A source list of prospective jurors is created from a list of licensed drivers, persons issued identification cards from the State, and any other person in the county who requests to be placed on the list. 14 M.R.S. § 1252–A(1) (2008).[12]

County not old enough to be eligible for jury duty.

10. Applying the absolute disparity test to the extent possible, to all minorities in Androscoggin County rather than just African–Americans, the disparity would be 3%, which is also statistically insufficient.

11. The trial court also considered updated census figures it found on the Internet, concluding in its written denial of Holland's motion to dismiss that the underrepresentation was still too small to make a prima facie claim pursuant to the Sixth Amendment.

That information is not part of the record. We rely on the material placed in the record by Holland in support of his motion. *See Beane v. Me. Ins. Guar. Ass'n,* 2005 ME 104, ¶¶ 9–10, 880 A.2d 284, 286 (stating that this Court does not consider new facts, exhibits, or other materials relating to the merits of an appeal that were not presented to the trial court and included in the trial court record).

12. Although the jury selection provisions discussed here are located in title 14 entitled "COURT PROCEDURE—CIVIL," these provisions apply to juries selected for criminal

A secondary list, called a master list, may be created from the source list when the court deems the volume of names on the source list too cumbersome to draw names. 14 M.R.S. § 1252–B (2008).

[¶ 36] Names are selected at random by computer from the source or master lists, and questionnaires are sent to determine whether the recipient is qualified to serve on a jury. 14 M.R.S. §§ 1252–A(2), 1252–B, 1253–A, 1254–A (2008); *see* Alexander, *Maine Jury Instruction Manual* § 1–1 (4th ed. 2009). "Random selection" refers to "the selection of names in a manner immune from the purposeful or inadvertent introduction of subjective bias, so that no recognizable class of the population on the lists from which the names are being selected can be purposely or inadvertently included or excluded." 14 M.R.S. § 1203–A(5) (2008). The court may excuse a prospective juror from service based on information provided on the juror qualification form due to undue hardship, extreme inconvenience, public necessity, or inability to serve due to mental or physical disability. 14 M.R.S. § 1213 (2008).

[¶ 37] Holland stated that his jury pool was developed in accordance with all statutory provisions, but failed to show how the use of lists of licensed drivers or state-issued identification cardholders, or anyone else who requests that his or her name be included on the source list, *see* 14 M.R.S. § 1252–A(1), results in systemic exclusion of African–Americans or other minorities. *See generally United States v.*

*Gonzalez–Velez*, 466 F.3d 27, 39 (1st Cir. 2006) (stating that it has been long-recognized that use of voter registration lists are an appropriate jury selection method).[13] As the trial court noted, the questionnaires sent to prospective jurors seek no information concerning their race, making it impossible for individuals of any particular race to be systematically excluded from the jury pool.

[¶ 38] Additionally, the fact that none of the eighty-one prospective jurors who actually appeared for jury selection at Holland's trial were, by outward appearance, African–Americans or other minorities is insufficient to support the conclusion that there is, *per se*, systemic exclusion of such groups from the Androscoggin County jury pool. *See, e.g., United States v. Espinoza*, 641 F.2d 153, 168 (4th Cir.1981) (declining to create a "per se" exception to the requirements set forth in *Duren* in a case in which the panel from which a petit jury in West Virginia was selected contained no Mexican–Americans); *cf. McGinnis v. Johnson*, 181 F.3d 686, 690 (5th Cir.1999) (stating that "a one-time example of underrepresentation of a distinctive group wholly fails to meet the systemic exclusion element in *Duren*") (quotation marks omitted).

[¶ 39] Finally, it is unknown how many African–Americans were in any jury pool other than Holland's. The court observed that African–Americans had been represented in small numbers in pools over the past twenty-five years. Contrary to Hol-

---

trials as well. *See, e.g., State v. Anaya*, 456 A.2d 1255, 1257 n. 1 (Me.1983).

**13.** Maine does require that, in addition to being a United States citizen, at least eighteen years old, and a county resident, an eligible juror must be able to read, speak, and understand English. 14 M.R.S. § 1211 (2008). However, the court must make a reasonable accommodation for individuals whose ability

to read, speak, or hear English, or otherwise serve as jurors, results from a physical disability. *Maine Jury Instruction Manual* § 1–4. Proficiency in English has been upheld as non-exclusive for purposes of a Sixth Amendment fair cross-section analysis. *See United States v. Gonzalez–Velez*, 466 F.3d 27, 39–40 (1st Cir.2006).

land's contention, we view this as more of an anecdotal remark than the court taking judicial notice of a fact, and regardless, the court's "fact" is of no probative value because it included no specific numbers. We are likewise unpersuaded by Holland's offer of proof that the assembled jury pool was "typical to the racial outcome," which he suggested he could support only by calling the clerk. *See State v. Albert,* 495 A.2d 1242, 1243 (Me.1985) ("In making an offer of proof the party offering the evidence must ensure that the trial court is *fully advised* as to the relevancy and admissibility of the proposed testimony.").

[¶ 40] Thus, Holland has not demonstrated a representation problem pursuant to either the second or third *Duren* elements and failed to establish a prima facie claim of a Sixth Amendment fair cross-section violation.

### 2. Equal Protection Analysis

[¶ 41] Although he has failed to demonstrate either underrepresentation or systematic exclusion, Holland argues that one can infer from the lack of racial minorities in his jury pool that there was purposeful discrimination, and that he has shown a prima facie case of a violation of his right to equal protection. Holland suggests that the venire pool of eighty-one potential jurors was not representative, and, assuming that the original pool of 151 people called for jury duty was representative, the very act of allowing people to be excused from jury duty for excuses or deferments caused the unfair representation from which we should infer an equal protection violation.

[¶ 42] "The Equal Protection Clause [of the Fourteenth Amendment] protects a criminal defendant against purposeful racial discrimination in the selection of his venire." *McGinnis,* 181 F.3d at 691 (quotation marks omitted). The bur-

den is on Holland to prove the existence of purposeful discrimination. *See id.*

[¶ 43] To establish a prima facie case of purposeful discrimination in juror summonsing, Holland must make one of two showings: (1) that his race was substantially underrepresented on the particular venire from which his jury was selected, and that the venire was selected under a practice providing an opportunity for discrimination, or (2) that, statistically, there has been systematic, long-term underrepresentation of his race on jury venires. *See United States v. Allen,* 160 F.3d 1096, 1104–05 (6th Cir.1998); *Cunningham v. Zant,* 928 F.2d 1006, 1013–14 & n. 9 (11th Cir.1991) (applying the tests laid out by the United States Supreme Court in *Castaneda v. Partida,* 430 U.S. 482, 494–95, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), in which the court analyzed an equal protection claim in the context of grand jury selection when statistical evidence showed Mexican–Americans were substantially underrepresented on grand juries over a period of eleven years, and in *Batson v. Kentucky,* 476 U.S. 79, 95, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to an equal protection challenge to underrepresentation of women and African–Americans in the venire).

[¶ 44] Holland has failed to establish a prima facie equal protection violation pursuant to either test articulated above. Even if we were to assume that African–Americans were substantially underrepresented on the particular venire from which his jury was selected, Holland presented no evidence that the venire was selected using a practice providing an opportunity for discrimination. Additionally, as discussed above, Holland provided no evidence that there has been systemic, long-term underrepresentation of African–Americans on Androscoggin County jury venires.

### 3. Other Arguments

■ [¶ 45] Holland also argues that Maine's Constitution guarantees him the right to a fair jury composed of a fair cross-section of citizens, as do several statutory provisions including 14 M.R.S. §§ 1201–A, 1202–A, 1208, 1209, 1214, and 1252–A (2008). He asserts that title 14 of Maine's Revised Statutes empowers a court to take steps, such as augmenting the jury pool generally or specifically with minorities or changing venue, to ensure fair representation in the jury process and a fair and impartial jury, and that the court erred by failing to take such steps. Because Holland failed to show the systemic exclusion of African–Americans from Androscoggin County juries or that he suffered actual prejudice in jury selection, the court did not abuse its discretion in declining to change venue or take steps to add African–Americans to the jury pool previously selected through a random and race-neutral selection process.[14]

## B. Denial of Challenges for Cause

### 1. Change of Venue

■ [¶ 46] Holland argues that the court should have granted his motion to change venue because a large proportion of the prospective jurors, and two members of his traverse jury, indicated at jury selection that they felt uncomfortable around African–Americans. A court's denial of a motion to change venue is reviewed for an abuse of discretion. *State v. Dyer*, 2007 ME 118, ¶ 14, 930 A.2d 1040, 1043; *State v. Corson*, 572 A.2d 483, 485 (Me.1990).

[¶ 47] Holland has not shown that he suffered "actual prejudice on the part of the venire persons" or that denial of his request to change venue amounted to an abuse of discretion. *See Corson*, 572 A.2d at 485. Approximately 20% of the eighty-one-person venire pool reported that they could not be fair and impartial jurors on the basis of race, and all of them were struck for cause. However, this Court has "never considered ratios determinative." *Id.* (finding no abuse of discretion when seventeen of fifty-five potential jurors acknowledged they might have difficulty remaining impartial and all seventeen were excused). Additionally, all other jurors who answered affirmatively to questions on the additional voir dire form were struck except for four jurors, two of whom were seated, both of whom stated they could be fair and impartial jurors. Holland has not shown actual prejudice on the part of the venire persons sufficient to require reversal as a matter of law or to demonstrate that the court abused its discretion in failing to change venue.

### 2. Refused Challenges

[¶ 48] Holland argues in a footnote that, after the court granted challenges for cause, 13.5% of the remaining jury pool admitted to feeling intimidated by or uncomfortable around African–Americans and that, despite his objection, the court did not strike these potential jurors, two of whom sat on Holland's traverse jury. Holland argues that, as a result, the court violated his right to the effective use of peremptory strikes and his right to a fair trial.

■ [¶ 49] We review the trial court's finding of juror impartiality for clear error, *State v. Rollins*, 2008 ME 189, ¶ 11, 961 A.2d 546, 549, and the conduct of voir dire for an abuse of discretion, *State v. Lowry*, 2003 ME 38, ¶ 7, 819 A.2d 331, 333.

[¶ 50] As we recently stated:

14. We express no opinion on a court's authority to augment a jury pool with members of a distinctive group of individuals as Holland suggests.

A missed opportunity to exercise a peremptory challenge does not by itself give a party the right to a new trial. There is no per se rule mandating the exclusion of a juror based on alleged bias or partiality. Rather, the test for determining whether a missed opportunity to use a peremptory challenge warrants a new trial is whether, when all the facts are known, actual bias or partiality is shown.

*Rollins*, 2008 ME 189, ¶ 20, 961 A.2d at 551; *cf. State v. McLean*, 2002 ME 171, ¶ 16, 815 A.2d 799, 805 (holding that the court's failure to allow the defendant to exercise peremptory challenges in accordance with the Maine Rules of Criminal Procedure constitutes reversible error without a showing of prejudice).

[¶ 51] In this case, the court did not limit Holland's right to exercise peremptory challenges as discussed in *McLean*, 2002 ME 171, ¶ 16, 815 A.2d at 805. Thus, to determine whether the court impaired Holland's right to use his peremptory strikes effectively, we must consider whether the court improperly denied Holland's challenges of the relevant potential jurors for cause and whether that resulted in actual prejudice to Holland.

[¶ 52] "When considering whether to grant a party's challenge for cause, the determination of existence of prejudice is for the trial court to make." *Rollins*, 2008 ME 189, ¶ 16, 961 A.2d at 550 (quotation marks and alteration omitted). "A trial court's determination that the juror remained impartial will stand unless it is clear to this [C]ourt that no competent evidence supports that decision." *Id.* ¶ 11, 961 A.2d at 549 (quotation marks omitted) (stating that the "court's determination is accorded substantial deference because of the court's ability to observe the juror and assess credibility").

[¶ 53] "When a juror's impartiality is questioned, the court should interview the juror to determine whether it is satisfied with the juror's ability to set aside whatever impressions or opinions the juror had of the witness and to participate in reaching a verdict based on the evidence and the law." *Id.* ¶ 12, 961 A.2d at 549 (quotation marks and alteration omitted); *Lowry*, 2003 ME 38, ¶¶ 4, 9, 819 A.2d at 333, 334 (stating that a trial court must conduct or permit further questioning concerning potential jurors' possible partiality in order to provide an adequate factual basis to rule on a challenge of those jurors for cause in a case in which the court denied the defendant's repeated requests for additional voir dire and her challenges for cause).

[¶ 54] The fact that a juror assures the court that the juror can remain impartial is significant to the court's determination as to whether a juror can in fact remain impartial. *Rollins*, 2008 ME 189, ¶ 12, 961 A.2d at 549. However, a juror's claim of an ability to remain impartial is not always adequate and is but one consideration. *Lowry*, 2003 ME 38, ¶ 8, 819 A.2d at 334.

[¶ 55] The court in this case granted the State's and/or Holland's challenges for cause related to the questionnaire with respect to approximately thirty-three potential jurors. Of the remaining jurors, Holland challenged four for cause because they had answered a question indicating that they felt anxious around or intimidated by African–Americans. These four potential jurors also stated that they did not think their feelings would make it more difficult for them to be fair and impartial. The court did not interview the four jurors to further probe their feelings about African–Americans or their ability to remain impartial. However, the court did ask all of the remaining potential jurors if,

because of their own beliefs or philosophy, they could not provide Holland with a presumption of innocence. No jurors responded that they could not accord Holland and the presumption of innocence. At the end of questioning by the court, the court asked whether Holland requested that any additional questions be asked of the jurors. Holland stated he did not request additional questions.[15]

[¶ 56] The assurance of the four challenged jurors as to their impartiality is competent evidence supporting the court's decision to deny Holland's challenge of these four for cause. *See Rollins*, 2008 ME 189, ¶¶ 11–12, 961 A.2d at 549; *cf. Lowry*, 2003 ME 38, ¶ 8, 819 A.2d at 334. Although the court might have interviewed the four potential jurors further, it expressly invited the jurors to respond if they thought they could not be impartial for any reason. Furthermore, the court gave Holland an opportunity to request additional questions of the jurors, which Holland declined.[16] This distinguishes this case from *Lowry* in which the court had denied the defendant's repeated requests to conduct follow-up questioning to discover the basis for answers that potential jurors had previously given that could call their impartiality into question. *Lowry*, 2003 ME 38, ¶¶ 3–4, 819 A.2d at 333.

[¶ 57] The court did not err in its determination that the four challenged jurors could be impartial when it denied Holland's challenge for cause to these four prospective jurors. *See Rollins*, 2008 ME 189, ¶¶ 16, 19–21, 961 A.2d at 550, 551 (holding that the defendant's right to exercise her peremptory challenges was not violated when the court allowed impaneled jurors to remain, even though they disclosed their connection to a State witness only after being impaneled, when competent evidence supported the court's finding that the jurors could be impartial).

## C. Competing Harms Instruction

[¶ 58] Holland argues that the court erred when it denied his request for a jury instruction on the defense of competing harms, 17-A M.R.S. § 103. Holland argues that, viewing the evidence in a light most favorable to him, he met all of the requirements for presenting the competing harms defense to the jury.

[¶ 59] "Before the competing harms justification can be submitted to a fact-finder, there must be evidence that, if believed by the fact-finder, would constitute a justification under 17–A M.R.S. § 103 ... to the charged criminal conduct." *Nadeau*, 2007 ME 57, ¶ 9 n. 1, 920 A.2d at 454; *see also State v. Lemieux*, 2001 ME 46, ¶ 3, 767 A.2d 295, 297 ("In competing harms cases, we require that the evidence, construed most favorably to the defendant, must be sufficient to make the existence of all facts constituting the competing harms justification a reasonable hypothesis for the fact finder to entertain.") (quotation marks omitted).

---

15. Holland exercised no peremptory strikes with respect to these four potential jurors, and two were ultimately impaneled. As long as a defendant exercised all of his peremptory strikes, as Holland did, the fact that he did not use them to strike a juror that he challenged for cause does not defeat his right to complain on appeal as to the impaneling of those jurors. *State v. Lowry*, 2003 ME 38, ¶¶ 12–13, 819 A.2d 331, 334–35.

16. This suggests no criticism of trial counsel. In the circumstances, when the race issue had already been addressed in some detail, counsel could have made a legitimate strategic choice not to seek further questioning that might have highlighted the issue further and only resulted in further evidence of the questioned jurors' capacity to be impartial. However, that strategic choice, once made, cannot be changed based on the adverse result at trial.

[¶ 60] Title 17–A M.R.S. § 103 provides:

**1.** Conduct that the person believes to be necessary to avoid imminent physical harm to that person or another is justifiable if the desirability and urgency of avoiding such harm outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the statute defining the crime charged. The desirability and urgency of such conduct may not rest upon considerations pertaining to the morality and advisability of such statute.

**2.** When the person was reckless or criminally negligent in bringing about the circumstances requiring a choice of harms or in appraising the necessity of the person's conduct, the justification provided in subsection 1 does not apply in a prosecution for any crime for which recklessness or criminal negligence, as the case may be, suffices to establish criminal liability.

[¶ 61] Four elements are required to generate a competing harms defense pursuant to 17–A M.R.S. § 103: (1) the defendant or another person must be threatened with imminent physical harm, when viewed objectively; (2) the present conduct must be for the purpose of preventing a greater harm, meaning, the urgency of the present harm must outweigh the harm that the violated statute seeks to prevent; (3) the defendant must subjectively believe that his conduct is necessary; and (4) the defendant must have no reasonable, legal alternatives to the conduct.

*Nadeau,* 2007 ME 57, ¶ 13, 920 A.2d at 455.

[¶ 62] As to the first element, it is not enough that the "defendant subjectively believes that a threat of imminent physical harm to person or property exists; it is further requisite that it be shown as a fact that such physical harm is imminently threatened." *Id.* ¶ 19, 920 A.2d at 457 (quotation marks omitted). The evidence admitted in this case, viewed most favorably to Holland, did not suggest that any person was at imminent risk of physical harm from downed trees or power lines on September 22, 2005, had Holland failed to cut down the poplar trees. The evidence also fails to make out the existence of the second and fourth elements. *See id.* ¶¶ 13, 20, 920 A.2d at 455, 457. Therefore, the evidence, when construed most favorably to Holland, was not sufficient to make the existence of all facts constituting a competing harms defense a reasonable hypothesis for the jury. *See Lemieux,* 2001 ME 46, ¶ 3, 767 A.2d at 297. The court did not err in denying Holland's request to instruct the jury on the defense.

The entry is:

Judgment affirmed.