2011 ME 81

**STATE of Maine**

v.

**Kaihlil T.P. NIGRO.**

Supreme Judicial Court of Maine.

Argued: Feb. 7, 2011.
Decided: July 19, 2011.

Jeremy Pratt, Esq. (orally), Camden, ME, for Kaihlil T.P. Nigro.

Janet T. Mills, Attorney General, Lisa R. Bogue, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

JABAR, J.

[¶ 1] Kaihlil T.P. Nigro appeals from a judgment of conviction of two counts of aggravated trafficking of scheduled drugs (Class A), 17–A M.R.S. § 1105–A(1)(B)(1) (2010), and an accompanying order for criminal forfeiture, 15 M.R.S. § 5826 (2010), entered in the Superior Court (Knox County, *Hjelm, J.*) following a jury trial. Nigro contends that he was deprived of a fair trial because the court did not ask prospective jurors whether they harbored prejudice or bias against members of the Islamic faith. Nigro also argues that the court erred in refusing to suppress (1) an out-of-court photographic identification made by a confidential informant, (2) evidence obtained during the execution of a search warrant, and (3) documents seized during his arrest. We affirm the judgment.

## I. BACKGROUND

[¶ 2] Viewing the evidence in the light most favorable to the court's order on the motion to suppress, and to the jury's verdict, the record supports the following facts. *See State v. Lavoie,* 2010 ME 76, ¶ 2, 1 A.3d 408, 410.

### A. Events Preceding the Issuance of the Search Warrant

[¶ 3] On June 25, 2009, a confidential informant working for the Maine Drug Enforcement Agency (MDEA) made a controlled purchase of diazepam pills from Jennifer Marriner in Rockland. Later, in August, Nigro and Jennifer's brother, Skip Marriner, arranged with Jennifer to sell cocaine.

[¶ 4] On August 25, 2009, the informant participated in a controlled purchase of cocaine at Jennifer's residence in Rockland. Jennifer, Skip, and Nigro were all present, although Nigro was introduced to the informant as "Jay." After meeting with MDEA agents, the informant conducted a second controlled purchase of cocaine at Jennifer's residence later that day. In total, the two controlled purchases of co-

caine lasted approximately fourteen minutes.

[¶ 5] Two days after the purchases, MDEA agent Kirk Guerrette met with the informant. At the meeting, the informant was shown two DMV photographs and was asked whether he recognized either of the men depicted. The informant identified the men as Skip Marriner and "Jay," both of whom had been present during the August 25 purchases. After identifying the men, the informant explained that he suspected the name "Jay" was an alias, and that the person he identified as "Jay" had "a funny last name or funny first name that he couldn't pronounce." Guerrette then told the informant that "Jay's" real name was Kaihlil Nigro, to which the informant replied, "[that] sounds about right."

### B. Issuance and Execution of the Search Warrant

[¶ 6] On August 27, 2009, Guerrette applied for a warrant to search Jennifer's residence. In support of the warrant application, Guerrette attached an affidavit describing the informant's interactions with Nigro and the Marriners. The affidavit explained that the informant, who was hoping to receive prosecutorial consideration on pending charges in exchange for information, "ha[d] proven reliable at least 3–4 times in the past," and had "provided information which [led] to several felony drug arrests." Based on Guerrette's affidavit, the District Court (Rockland, *Field, J.*) issued a search warrant.

[¶ 7] On September 1, 2009, law enforcement executed the search warrant. Guerrette was informed that Skip and Nig-

ro had briefly left Jennifer's residence, and Guerrette attempted to locate them. After spotting Skip and Nigro walking along a nearby street, officers detained both men by blocking the road and placing them in handcuffs. While Guerrette was occupied with Skip, another officer briefly spoke with Nigro, at which time Nigro asked to speak with an attorney.[1] Skip and Nigro were transported to Jennifer's residence in a police vehicle, and Guerrette interrogated Nigro in a different vehicle at the residence, after advising Nigro of his *Miranda* rights.[2] *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). During the interrogation, Nigro made incriminating statements and turned over an owner's manual from his pocket, which corresponded to a safe found in Jennifer's residence. That safe, revealed at trial to be Nigro's, contained nearly fifty-eight grams of cocaine, along with other drug paraphernalia. Based on these events, Nigro was indicted on two counts of aggravated trafficking of scheduled drugs (Class A), 17–A M.R.S. § 1105–A(1)(B)(1), and a charge of criminal forfeiture, 15 M.R.S. § 5826.

### C. Motion to Suppress

[¶ 8] After pleading not guilty to all charges, Nigro moved to suppress (1) his statements to the police, arguing that they were obtained in violation of his *Miranda* rights; (2) evidence gathered from the search of Jennifer's residence, arguing that Guerrette's warrant affidavit did not sufficiently establish probable cause; and (3) the informant's identification of him, arguing that the identification procedure

---

1. Although the testimony regarding whether Nigro asked to speak with an attorney is conflicting, we have no reason to question the suppression court's finding that Nigro invoked his right to counsel.

2. The interrogation was recorded, but Nigro's response to Guerrette's *Miranda* warning is inaudible.

used was unnecessarily suggestive and unreliable.

[¶ 9] In December 2009, after a hearing, the Superior Court (*Hjelm, J.*) entered an order granting in part and denying in part Nigro's motion to suppress. The court granted the motion with respect to Nigro's statements to the police, finding that Nigro had invoked his right to counsel. Denying the motion in all other respects, the court found that the affidavit established probable cause to issue the search warrant, and that the informant's identification of Nigro, although made under a suggestive procedure, was nevertheless reliable.

### D. Jury Trial

[¶ 10] Jury selection occurred on November 30, 2009. The court conducted voir dire of the jury panel, asking standard questions to discern whether any prospective jurors had connections with law enforcement, potential witnesses, or the attorneys. The court also asked whether any member of the jury panel would "have any difficulty applying th[e] presumption of innocence in this case, the case of State of Maine versus Kaihlil Nigro, involving two counts of aggravated trafficking in cocaine." [3] Near the conclusion of voir dire, the court posed a final question:

> Is there any reason why any of you feel that you could not sit as a fair and impartial juror in the case for reasons other than the reasons I've covered up to this point ... is there anybody who for any other reason feel you could not sit as a fair and impartial [juror] in this case?

**3.** One prospective juror responded in the affirmative and was excused for cause.

**4.** The court also revoked Nigro's probation, which he had been serving at the time of his

No juror responded. Before addressing challenges to prospective jurors, the court asked the parties if there was "any additional general voir dire [they] are asking for." Both attorneys responded, "No."

[¶ 11] Shortly before trial began, the State filed a motion in limine seeking a ruling that the owner's manual found in Nigro's pocket was admissible. Over Nigro's objection, the court granted the motion, observing that Nigro failed to move for the exclusion of the manual in his original motion to suppress.

[¶ 12] Following a two-day trial in December 2009, the jury found Nigro guilty of both counts of aggravated trafficking of scheduled drugs, and, by agreement of the parties, the court entered a judgment for criminal forfeiture. The court sentenced Nigro to ten years' incarceration for each count, to be served concurrently, with all but seven years suspended, and four years of probation.[4]

## II. DISCUSSION

[¶ 13] Nigro's appeal raises four issues. First, we address whether the court erred by not asking prospective jurors if they harbored anti-Islamic bias. Second, we consider whether the confidential informant's in-court and out-of-court identifications were properly admitted at trial. Third, we examine whether Guerrette's warrant affidavit established probable cause to justify the issuance of a warrant to search Jennifer's residence. Fourth, we decide whether the court erred in allowing the owner's manual found in Nigro's pocket to be admitted in evidence.

arrest, and activated the suspended sentence to be served concurrently with these sentences.

## A. Voir Dire

[¶ 14] Nigro argues that he was deprived of a fair trial because, during voir dire, the court did not ask potential jurors whether they harbored any anti-Islamic prejudice. Although we generally review a court's management of voir dire for an abuse of discretion, *see State v. Holland,* 2009 ME 72, ¶ 49, 976 A.2d 227, 241, Nigro failed to raise this issue during jury selection. Thus, our review is limited to obvious error.[5] *See State v. Burdick,* 2001 ME 143, ¶ 29, 782 A.2d 319, 328.

[¶ 15] "The purpose of the voir dire examination is to detect bias and prejudice in prospective jurors, thus ensuring that a defendant will be tried by as fair and impartial a jury as possible." *State v. Lowry,* 2003 ME 38, ¶ 7, 819 A.2d 331, 333–34 (quotation marks omitted). Although voir dire questioning must be sufficient to disclose facts that would expose juror bias, *id.* ¶ 11, 819 A.2d at 334, there is " 'no constitutional presumption of juror bias for or against members of any particular racial or ethnic group,' " *State v. Turner,* 495 A.2d 1211, 1212 (Me.1985) (quoting *Rosales–Lopez v. United States,* 451 U.S. 182, 190, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981)). Rather, it is "[o]nly when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case," such as when these types of prejudice are "inextricably bound up with the case," that a trial court is constitutionally required to further examine a juror's impartiality. *Turner,* 495 A.2d at 1212–13 (quotation marks omitted).

[¶ 16] The voir dire process here, viewed in its entirety, afforded Nigro a fair and impartial jury. Initially, we note that Nigro refers only to his "perceived ethic or religious origin," based on his "clearly Islamic name and non-white appearance." There is, however, no record evidence that Nigro is a member of the Islamic faith, or that he was, in fact, perceived that way by the jury. At oral argument, Nigro's appellate counsel expressed his understanding that Nigro is "at best ... agnostic, and probably an atheist since his time incarcerated."

[¶ 17] In any event, Nigro is not entitled to a presumption of juror bias. Neither religion generally, nor the Islamic faith specifically, was "inextricably bound up with" the drug charges at issue in this case. *See Turner,* 495 A.2d at 1213. Moreover, although the court did not ask whether potential jurors held anti-Islamic views, the court's questions did emphasize the importance of fairness and impartiality. *Cf. State v. Collin,* 1999 ME 187, ¶ 7, 741 A.2d 1074, 1077 ("[W]e have upheld voir dire queries which addressed potential juror bias more generally than the defendant wished.").

[¶ 18] Nigro's reliance on our decision in *State v. Lovely,* 451 A.2d 900 (Me.1982), is misplaced. In *Lovely,* the defendant was charged with arson, and "[p]retrial discovery suggested and the evidence at trial disclosed that the structure was a gay bar, frequented by homosexuals, and that defendant was a patron." *Id.* at 901. During voir dire, the trial court summarily refused the defendant's request "that the jurors be asked about any bias they might have toward homosexuals." *Id.* In review-

---

5. Contrary to Nigro's suggestion, our opinion in *State v. Lovely,* 451 A.2d 900 (Me.1982), did not alter the obvious error standard generally applicable to unpreserved objections. Although *Lovely* emphasized that "it is the trial justice, not the defense attorney, who is re-

sponsible for the fairness of the proceeding," that case involved review of a preserved issue: the trial court's *refusal* of "defense counsel's sole *request* that the jurors be asked about any bias they might have toward homosexuals." *Id.* at 901–02 (emphasis added).

ing the voir dire process on appeal, we noted that the court had not "abused [its] discretion in determining whether the proposed question was germane to [a] juror's qualifications." *Id.* Instead, we found error in the court's failure "to develop the factual circumstances so that [it] could make an informed judgment on whether [the defendant's requested voir dire] was necessary." *Id.* at 902.

[¶ 19]  In short, *Lovely* involved a request for voir dire aimed at a type of bias that was directly intertwined with the charges alleged in that case. Conversely, here, Nigro declined the court's offer to ask additional voir dire questions, and the potential bias he alleges on appeal is unrelated to the crimes for which he was convicted. Nigro has not established that the court committed obvious error in conducting voir dire.

## B.  Identification

[¶ 20]  Nigro next challenges the court's admission of the in-court and out-of-court identifications made by the confidential informant.  He asserts that the procedures related to the confidential informant's identification were impermissibly suggestive and unreliable.

[¶ 21]  We apply a two-part test to determine whether an out-of-court identification should be admitted in evidence. *State v. Kelly,* 2000 ME 107, ¶ 19, 752 A.2d 188, 192.  First, "the defendant must prove, by a preponderance of the evidence, that the identification procedure was suggestive." *Id.* Second, if the court finds that the procedure was suggestive, "the State then bears the burden of proving, by clear and convincing evidence, that in the totality of the circumstances the identifica-

tion, although made under a suggestive procedure, is nevertheless reliable."[6]  *Id.* We review the suppression court's factual findings for clear error and its legal conclusions de novo.  *See State v. DiPietro,* 2009 ME 12, ¶ 13, 964 A.2d 636, 640; *State v. Reeves,* 499 A.2d 130, 136 (Me.1985).

[¶ 22]  As the suppression court found, the out-of-court identification procedure utilized here was clearly suggestive. The informant was shown only two photographs: a single photograph of Nigro and a single photograph of Skip. Numerous courts, including our own, have condemned the display of a single photograph as an inherently suggestive identification practice.  *See, e.g., United States v. Johnson,* 114 F.3d 435, 441 (4th Cir.1997) ("The Supreme Court has consistently questioned the use of a single photograph for pretrial identification, and has encouraged the use of a reasonable photographic display."); *United States v. Murdock,* 928 F.2d 293, 297 (8th Cir.1991) ("[S]ingle photograph arrays are considered impermissibly suggestive in the Eighth Circuit."); *Nassar v. Vinzant,* 519 F.2d 798, 801 (1st Cir.1975) (recognizing that "[s]ingle photo identifications do, indeed, present so serious a danger of suggestiveness as to require that they be given extremely careful scrutiny"); *State v. Cefalo,* 396 A.2d 233, 238 n. 9 (Me.1979) ("We have repeatedly condemned the type of single-person photographic showup which the police employed in this case....").

[¶ 23]  Although we do not condone the unnecessarily suggestive methods utilized in this case, an identification may be admissible if its reliability outweighs the corruptive influence of the suggestive

---

6.  When clear and convincing evidence is required, "we look to whether the factfinder reasonably could have been persuaded that the required factual finding was or was not

proved to be highly probable." *Baillargeon v. Estate of Daigle,* 2010 ME 127, ¶ 16, 8 A.3d 709, 714 (quotation marks omitted).

procedure. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Kelly,* 2000 ME 107, ¶ 19, 752 A.2d at 192; *State v. Philbrick,* 551 A.2d 847, 849 (Me.1988). We consider several factors in determining the reliability of an identification, including: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *State v. True,* 464 A.2d 946, 950 (Me.1983) (citing *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

[¶ 24] Applying these criteria to the case before us, we conclude that the informant's identification of Nigro was independently reliable. In particular, the informant (1) had directly observed Nigro during two controlled drug purchases, (2) was assisting law enforcement and therefore likely paying close attention to his surroundings, (3) expressed certainty in identifying Nigro's picture, and (4) identified Nigro only two days after the purchases occurred. Accordingly, we hold that the informant's identifications were properly admitted at trial despite the unnecessarily suggestive identification procedure.[7]

C. Search Warrant

[¶ 25] As his third contention, Nigro maintains that Guerrette's warrant affidavit failed to establish probable cause

because the confidential informant was not a reliable source of information. We disagree.

[¶ 26] In determining whether a search warrant affidavit sufficiently establishes probable cause, we "review directly the finding of probable cause made by the judicial officer who issued the warrant, affording that finding great deference." *State v. Samson,* 2007 ME 33, ¶ 11, 916 A.2d 977, 980. Probable cause is established when, "given all the circumstances set forth in the affidavit before [the judicial officer], including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Rabon,* 2007 ME 113, ¶ 22, 930 A.2d 268, 276 (quotation marks omitted). We give the affidavit "a positive reading and review the affidavit with all reasonable inferences that may be drawn to support the [judicial officer]'s determination." *Id.* ¶ 22, 930 A.2d at 276–77 (quotation marks omitted).

[¶ 27] According to Guerrette's affidavit, the informant had previously given reliable information that led to several felony drug arrests.[8] *See* 2 Wayne R. La-Fave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.3(b) at 115 (4th ed. 2004) ("[C]ourts have with virtual unanimity held that a declaration that the informant's past information has led to convictions is sufficient showing of the informer's credibility."). Most significantly, the informant personally participated in

---

7. Because the court did not err in refusing to suppress the out-of-court identification, the in-court identification was also admissible. *See State v. Baker,* 423 A.2d 227, 230 (Me. 1980) ("[O]ur conclusion that the out-of-court identifications were not impermissibly tainted makes the in-court identifications *per se* lawful.").

8. The informant, although confidential, was not anonymous. *See United States v. Brown,* 500 F.3d 48, 54 (1st Cir.2007) ("Since [the informant] was known to the police, he could have been held accountable if his information proved inaccurate or false.").

the controlled drug purchases, which were closely monitored by law enforcement through surveillance equipment. *See State v. Haley,* 571 A.2d 831, 833 (Me.1990); *see also United States v. Khounsavanh,* 113 F.3d 279, 285–87 (1st Cir.1997) (noting that an informant's controlled purchase corroborated his tip that individuals were selling drugs). Given these considerations, Guerrette's affidavit contained more than sufficient information upon which to base a finding of probable cause.

D. Owner's Manual

[¶ 28] Nigro's final argument—that the court erred in allowing the owner's manual to be admitted in evidence—is also without merit. As the State correctly argues, Nigro's motion to suppress the manual was untimely. "Rule 41A(b) of the Maine Rules of Criminal Procedure, read in conjunction with Rule 12(b)(3) requires that motions to suppress be filed within 21 days after entry of a plea. A party failing to comply with these time requirements loses the right to file the motion." *State v. Kennedy,* 2002 ME 5, ¶ 6, 788 A.2d 174, 176 (citations omitted). Nigro failed to mention the manual in his original motion to suppress, did not argue for its suppression at the suppression hearing, and, consequently, the court's suppression order did not address the issue. Although a court has discretion to entertain an untimely motion when good cause is shown, *see* M.R.Crim. P. 41A(b), Nigro made no such showing, and the court did not err in refusing to suppress the manual. Even if the issue were timely raised, Nigro's argument that the manual was suppressible as fruit of the *Miranda* violation must fail because the manual inevitably would have been discovered and seized once Nigro was searched incident to his lawful arrest. *See State v. Nadeau,* 2010 ME 71, ¶ 38, 1 A.3d 445, 459–60 (discussing the "inevitable discovery" exception to the exclusionary rule); *State v. Foy,* 662 A.2d 238, 241 (Me.1995) (applying the "search incident to arrest" doctrine).

The entry is:

Judgment affirmed.