MAINE SUPREME JUDICIAL COURT                         Reporter of Decisions
Decision:      2016 ME 110
Docket:        Yor-15-433
Argued:        June 9, 2016
Decided:       July 14, 2016

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and
               HUMPHREY, JJ.

STATE OF MAINE

v.

DEREK S. POULIN

ALEXANDER, J.

[¶1] Derek S. Poulin appeals from a judgment of conviction for murder, 17-A M.R.S. § 201(1)(A), (B) (2015), and arson (Class A), 17-A M.R.S. § 802(1)(A) (2015), entered by the Unified Criminal Docket (York County, *O'Neil, J.*) after a jury trial.

[¶2] The issues in this case arise from the trial court's exclusion of certain evidence—GPS data and handwritten notes—from the State's case-in-chief because of discovery violations or hearsay problems. However, the court indicated that the excluded evidence would or might be available for use as impeachment evidence should the defense offer evidence contrary to the facts indicated by the excluded evidence. On appeal, Poulin argues that his constitutionally guaranteed right to a fair trial was violated because these evidentiary rulings effectively

prevented him from presenting evidence contrary to the facts indicated in the excluded evidence. Because the rulings excluding evidence from use in the State's case-in-chief reflected no abuse of the trial court's discretion and did not deprive Poulin of a fair trial, we affirm.

## I. CASE HISTORY

[¶3] Viewing the evidence in the light most favorable to the State, the following facts are supported by the trial record. *See State v. Reed*, 2013 ME 5, ¶ 9, 58 A.3d 1130. In the afternoon of October 23, 2012, the body of the victim, Poulin's paternal grandmother, was discovered in her home in Old Orchard Beach. She had been struck in the head with blunt objects and stabbed many times in the head, neck, and torso, suffering a total of seventy-two blunt-force and sharp-force injuries. The victim's home had been set on fire.

[¶4] Before her death, the victim had shared her home with Poulin and Poulin's father. Poulin's father and grandmother both worked, but Poulin was unemployed. Around October 18, 2012, the victim had a conversation with a relative about how she needed to show Poulin some "tough love" and tell him to move out. The victim stated that she had tried to do that, but that she would have to try again.

[¶5] Just after 7:00 a.m. on October 23, 2012, Poulin's father arrived at work in Portland. Around 11:30 a.m., the victim spoke to a relative on the phone

and told him that she was getting ready for work. She asked the relative to call her that afternoon after he finished an appointment. The relative called the victim's phone repeatedly after about 1:00 p.m., but she did not answer.

[¶6] At approximately 1:40 p.m., a woman who lived directly across the street from the victim's house noticed that the smoke detector was sounding in the victim's home. When, about thirty minutes later, the neighbor observed that the alarm was still sounding, she approached the house, saw that the window blinds were melting, saw smoke in the house, and called 9-1-1.

[¶7] Firefighters arrived, extinguished the fires in the house, and discovered the victim's body on the floor of the downstairs bedroom. When Poulin's father returned home from work around 4:20 p.m., investigators from the Fire Marshal's Office stopped him from entering the home. Poulin's father was "visibly shaken" upon learning that his mother had died. While Poulin's father was with one of the investigators, around 4:23 p.m., he received a call from Poulin. Poulin's father told Poulin about the fire. The investigator observed that Poulin's father became angry during the call.

[¶8] At 5:33 p.m., an hour and ten minutes after the phone call, Poulin arrived at the house. He and his father agreed to be interviewed at the police station, and the two of them drove there together in Poulin's car. At the police station, they were interviewed separately. Poulin stated that he had left his

4

grandmother's house by 11:30 that morning and had gone to the Portland office of the Bureau of Motor Vehicles (BMV) to renew his driver's license, then to his mother's apartment in Portland, where no one was home, and then to his dentist's office around 1:00 p.m. to make an appointment to have dental work done. He told the police that he then returned to his mother's apartment, where he stayed until he called his father to get dental insurance information. Poulin told the police that his mother and siblings were home when he arrived at his mother's home the second time. He told the police that he "rushed" to his grandmother's house after the phone call. When asked why it took him so long to get to the house, he stated, "Five o'clock traffic, man." Poulin returned to his mother's apartment after the interview.

[¶9]  In the evening of October 23, after a deputy medical examiner noted that the victim had cuts and lacerations on her neck and shoulders and saw indications that she had died before the fire was set, law enforcement officers went to Poulin's mother's house. They asked Poulin for the clothing he had been wearing that day, and he gave them a white t-shirt, a pair of white pants, and a pair of boots. Poulin stated that those were the clothes he had been wearing when he left his grandmother's house to go to Portland. Poulin also allowed the police to take his car.

[¶10]  In Poulin's car, a police officer found a receipt from the BMV that was time-stamped 3:08 p.m. on October 23, 2012, as well as an entry ticket from the BMV that same day, which was time-stamped 2:54 p.m.[1]  Surveillance footage from the BMV revealed that, when Poulin was at the BMV around 3:00 p.m., he was wearing a different shirt and pants than he gave the police that night (blue jeans and a brown t-shirt, rather than the white t-shirt and white pants).

[¶11]  In Poulin's car, police also found an October 23, 2012, receipt from a Portland secondhand store, which was time-stamped 4:56 p.m.  The cashier who had operated the register that printed the 4:56 p.m. sales receipt at the secondhand store remembered Poulin coming into the shop on October 23, as Poulin had shopped there regularly.  Poulin had carried a backpack into the store.  Although the cashier could not remember what Poulin had purchased, she testified that the UPC code on the receipt indicated that it was men's clothing, and the price indicated that it was a pair of pants.

[¶12]  The receptionist at the dentist's office remembered Poulin coming into the office on October 23 around 4:00 p.m. to schedule an appointment for two

---

[1]  Police also found an entry ticket from the BMV that was time-stamped at 11:52 a.m. on October 23, 2012.  Records at the BMV revealed that a woman had pulled the 11:52 ticket and had been helped by a particular agent at the BMV.  The same agent assisted Poulin when he arrived at the BMV later that day.  The jury could infer that Poulin found the 11:52 ticket when he was at the agent's desk later that day and took it, planning to produce it as support for his alibi that he had left the house before his grandmother was killed.

6

days later. The receptionist offered to schedule his appointment at the dentist's Biddeford office so Poulin would be closer to his home in Old Orchard Beach. He declined, telling her he "[w]ould be in the Portland area."

[¶13] Further investigation revealed that the victim had died from "[m]ultiple blunt impact and sharp force injuries." Medium to heavy petroleum distillates were detected on various samples taken from the victim's bedroom and bathroom. Police found a knife, a wrench, and a golf club[2] with the head snapped off in the bathroom shower. They also discovered a handwritten note, dated October 7, 2012, next to the victim's purse: "woke [Poulin's father] up told him Derek better find another place to live." The Maine State Crime Lab determined that the victim's DNA was present in a stain on the left boot Poulin had given to the police.

[¶14] On October 29, 2012, Poulin was charged by criminal complaint with murder, 17-A M.R.S. § 201(1)(A), and arson, 17-A M.R.S. § 802(1)(A). In December 2012, a grand jury returned an indictment for intentional or knowing or depraved indifference murder, 17-A M.R.S. § 201(1)(A), (B), and arson, 17-A M.R.S. § 802(1)(A). Poulin entered pleas of not guilty to the charges.

---

[2] Poulin's mother testified that Poulin would sometimes "go to the driving range, go bat some golf balls" when he was upset. Police found another golf club in the trunk of Poulin's car.

[¶15]   In November 2014, the jury trial was scheduled to commence on June 8, 2015.[3]   In April 2015, Poulin filed a motion in limine seeking to exclude seven handwritten notes that were purportedly written by the victim.  Two of the notes were dated and had been discovered next to the victim's purse, on the kitchen table.  Five of the notes were undated and had been torn into pieces—these notes were discovered in a trash can in the bedroom where the victim's body was found.  Although only the two dated notes were in the record provided to us on appeal, the transcript of the hearing on Poulin's motion indicates that all seven notes contained what the State argued were the victim's handwritten statements documenting arguments and sometimes physical altercations between her and Poulin.

[¶16]   On June 8, 2015, the day that jury selection began, Poulin filed a motion for sanctions, seeking to entirely exclude from trial the GPS tracking data that had been recovered from a device in Poulin's car but that had not been provided to the defense team until June 5, 2015.  The transcript of the hearing on Poulin's motion in limine and the trial transcripts demonstrate the following facts regarding the GPS data.  On June 5, the State's attorney learned from a detective

---

[3]   The trial was initially scheduled to begin a year earlier, on June 9, 2014, after the parties had litigated pretrial issues, including a motion to suppress Poulin's statements to police and Poulin's competency to be tried. The June 2014 trial date was continued in April 2014 at the request of Poulin's counsel so that Poulin's competency could be examined a second time.  In June 2015, before the jury trial commenced, the court held a hearing and determined that Poulin was competent to be tried.  His competency is not at issue on appeal.

assigned to the Maine State Police Computer Crimes Unit that GPS tracking data existed and that the data showed Poulin's car's whereabouts on the day of the victim's death. Until that point, both the State's counsel and Poulin's counsel had been under the impression that the GPS device in Poulin's car had not recorded any data on the pertinent date: October 23, 2012. Sometime in the morning of June 5, a detective provided the State's attorney with a disc, which contained a download from Google Earth. The GPS data had been recorded in what is known as "Zulu time" and had been converted into Eastern Standard Time. The download showed Poulin's car's path of travel from Old Orchard Beach to Portland, and the time of his departure from Old Orchard Beach (around 1:30 p.m.) did not match the around 11:30 a.m. time of departure Poulin had told law enforcement when he was interviewed on the day of the victim's death.

[¶17] The State's attorney provided defense counsel with a copy of the disc around 2:00 p.m. on the same day that the State's attorney became aware of the data's existence. Defense counsel also received "a very brief report" that said that a named detective had extracted the data and had put the data on a disc, and that the disc had been "ready for pick up February 6th of 2013." The report also stated that Google Earth had to be used in order to interpret the data. The data was not accompanied by an expert report.

[¶18]   Prior to trial, the court held a hearing on Poulin's motions regarding the handwritten notes and the GPS data.  The State conceded that the GPS data was subject to automatic discovery pursuant to M.R.U. Crim. P. 16(a) and that a violation of that rule had occurred, as the State's law enforcement officers had been in possession of the data.  *See* M.R.U. Crim. P. 16(a)(1), (2)(F).  The State decided not to seek to use the data in its case-in-chief, calling this decision a "self-imposed sanction."  The State argued, however, that it should be permitted to use the data for impeachment purposes if a witness testified that Poulin was somewhere that the data would appear to contradict.  Poulin argued that the data should be excluded for all purposes, including impeachment.  He argued that "[t]here is a question in this instance of what . . . this evidence stands for," apparently referencing the time zone differences, and he argued that he could not understand the data and effectively challenge the veracity of the data without the benefit of an expert.

[¶19]   The court stated that it would likely grant Poulin a continuance if he requested one, in order to allow Poulin to find and consult with an expert about the GPS data.  Poulin chose not to move for a continuance.  The court ruled that the GPS data would be excluded from the State's case-in-chief because the State had not timely disclosed the automatically discoverable evidence, and Poulin would be prejudiced if he had to defend against the data during the State's case-in-chief.

The court ruled that the data would be admissible for impeachment purposes, however, if a witness testified that Poulin was located somewhere at a particular time that the data would contradict. In part, the court reasoned that even some illegally obtained evidence may be used for impeachment purposes in certain instances. *See, e.g.*, *Walder v. United States*, 347 U.S. 62, 65 (1954). The court stated that it would give the jury a limiting instruction if the evidence were admitted for impeachment purposes.

[¶20] Regarding the handwritten notes, Poulin argued that the notes were irrelevant and unreliable, that the prejudicial effect of the notes outweighed their probative value, that they constituted improper character evidence, and that their admission would violate Poulin's constitutional right to confront witnesses against him. The State indicated that it was primarily interested in offering the two dated notes at trial but argued that all seven notes were admissible to prove that the victim planned to tell Poulin to leave and to prove the identity and motive of the killer, as they demonstrated the relationship between Poulin and the victim.

[¶21] The court ruled that it would exclude all of the notes except a redacted version of one of the dated notes, which would be admissible to demonstrate that the victim wanted Poulin to move out. The court stated that it would revisit its ruling regarding the other statements contained in the notes if Poulin attempted to demonstrate that he and the victim had a "good relationship."

[¶22] The parties proceeded to a jury trial, and evidence was presented over six days. Neither the GPS data nor the handwritten notes were offered or admitted at trial, except for the redacted version of one of the dated notes, which is referenced in the facts above and is not at issue on appeal.

[¶23] The jury found Poulin guilty of both charges. The court sentenced Poulin to life in prison for the murder and a concurrent thirty-year term of imprisonment for the arson. It also ordered him to pay $5,307.44 to the Victim's Compensation Fund, along with other fees. Poulin filed this timely appeal.[4]

## II. LEGAL ANALYSIS

[¶24] On appeal, Poulin argues that the trial court violated his right to a fair trial when it ruled that the GPS data would be admissible for impeachment purposes, which he argues prejudiced him because he altered his trial strategy to avoid opening the door to the data. He also argues that the trial court violated his right to a fair trial when it stated that it would revisit its ruling regarding the admissibility of the handwritten notes if Poulin put his relationship with the victim at issue. We address these contentions in turn.

---

[4] Poulin also applied for leave to appeal from his sentence. *See* 15 M.R.S. §§ 2151, 2153 (2015); M.R. App. P. 20(a). The Sentence Review Panel denied his application in October 2015. *See* 15 M.R.S. § 2152 (2015); M.R. App. P. 20(f).

12

## A.    GPS Data

[¶25]  A criminal defendant has a right to a fair trial, which is protected by the United States and Maine Constitutions.  U.S. Const. amends. VI, XIV, § 1; Me. Const. art. I, § 6.  We will vacate a judgment of conviction and remand for a new trial if a discovery violation so prejudices a defendant that he or she is deprived of a fair trial.  *State v. Cruthirds*, 2014 ME 86, ¶ 37, 96 A.3d 80.

[¶26]  We look first at Maine Rule of Unified Criminal Procedure 16. There is no dispute that a violation occurred when the State failed to timely disclose the GPS data, which State law enforcement had in its possession. *See* M.R.U. Crim. P. 16(a)(1), (a)(2)(F), (b).[5]  That the State's attorney did not act in bad faith and that the State only sought to use the data for impeachment purposes is of no relevance to the determination of whether Rule 16 was violated. *State v. Landry*, 459 A.2d 175, 177 (Me. 1983).

[¶27]  Generally, when faced with a discovery violation, "the trial judge has broad discretion in choosing the form of sanction to impose, if any at all."  *State v. Mylon*, 462 A.2d 1184, 1186 (Me. 1983); *see also* M.R.U. Crim. P. 16(e) ("If the

---

[5]  Rule 16 of the Maine Rules of Unified Criminal Procedure requires an attorney for the State to automatically provide a defendant with discovery of many types of evidence, including any "electronically stored information . . . that the attorney for the State intends to use as evidence in any proceeding or that [was] obtained or belong[ed] to the defendant."  M.R.U. Crim. P. 16(a)(2)(F).  This obligation "extends to matters within the possession or control of . . . any official or employee of this State or any political subdivision thereof who regularly reports or who, with reference to a particular case, has reported to the office of the attorney for the State."  M.R.U. Crim. P. 16(a)(1).  Rule 16(b) sets out timeframes for disclosure.

attorney for the State fails to comply with [Rule 16's requirements], the court . . . may take appropriate action . . . .").[6] The trial court cannot, however, permit a discovery violation to deprive a defendant of a fair trial. *See Cruthirds*, 2014 ME 86, ¶ 37, 96 A.3d 80; *State v. Ledger*, 444 A.2d 404, 412 (Me. 1982); *State v. Thurlow*, 414 A.2d 1241, 1244 (Me. 1980).

[¶28] We review for an abuse of discretion a trial court's sanction for a discovery violation. *See State v. Hutchins*, 433 A.2d 419, 421 (Me. 1981). We look for a prejudicial effect on the defendant as a result of the discovery violation, as mitigated—or not—by the trial court's ruling. *See Cruthirds*, 2014 ME 86, ¶¶ 37, 39, 96 A.3d 80; *Ledger*, 444 A.2d at 411; *Thurlow*, 414 A.2d at 1244. When a defendant contends that a discovery violation and the court's response to it violated his or her right to a fair trial, we review the trial court's "procedural rulings to determine whether the process struck a balance between competing concerns that was fundamentally fair." *Cruthirds*, 2014 ME 86, ¶ 37, 96 A.3d 80 (quoting *In re A.M.*, 2012 ME 118, ¶ 14, 55 A.3d 463).

[¶29] In this case, we conclude that there was no prejudicial effect upon Poulin and that the trial court's ruling struck a balance between competing interests

---

[6] Much of our discovery violation precedent cites to M.R. Crim. P. 16(d) (repealed 2015), which is the predecessor to current M.R.U. Crim. P. 16(e). Save for the addition of the option to dismiss a case without prejudice, they are the same. *See* M.R.U. Crim. P. 16 Advisory Committee's Note to 2014 amend.

14

that was fundamentally fair when it ruled that the late-disclosed GPS data would be excluded from the State's case-in-chief but would be admissible for impeachment purposes. The purposes of Rule 16 are to "enhanc[e] the quality of the pretrial preparation of both the prosecution and defense and diminish[] the element of unfair surprise at trial, *all to the end of making the result of criminal trials depend on the merits of the case* rather than on the demerits of lawyer performance on one side or the other." *Thurlow*, 414 A.2d at 1244 (emphasis added).

[¶30] Here, the trial court was faced with difficult circumstances. Days before a murder and arson trial that had been scheduled for many months, the State disclosed to Poulin GPS data indicating that Poulin's car was at the scene of the murder and arson until about 1:30 p.m. on the day of the crimes. Witness testimony indicated that the victim was alive at 11:30 a.m., that she did not answer her phone after 1:00 p.m., and that the fire had been set by 1:40 p.m. The State's attorney had been told previously that there was no GPS data, he disclosed the data the same day he became aware of its existence, and he had made the detective who extracted the data available to Poulin's counsel, although a meeting had not taken place. *See Landry*, 459 A.2d at 177 ("The good faith of the State's attorney . . . may be a relevant consideration in selecting a sanction.").

[¶31] The record demonstrates that the court thoughtfully considered the circumstances of the late disclosure and the interests at issue when it concluded

that Poulin would be unfairly prejudiced if he had to defend against the GPS data during the State's case-in-chief. The court's ruling that either party could use the data to impeach a witness who testified in conflict with the data did not deprive Poulin of a fair trial. The court had offered to continue the trial if Poulin requested so that Poulin could obtain an independent expert on the GPS data. Further, the court's ruling permitted Poulin to choose whether to present alibi evidence and defend against the contrary GPS data or avoid admission of the data altogether.

[¶32]    Poulin argues that the trial court erred when it analogized the circumstances of his case to instances where illegally obtained evidence may be used for impeachment purposes. We disagree. The Supreme Court of the United States held in *Walder*, that a trial court did not err when it permitted a prosecutor to impeach a defendant with evidence obtained in violation of the Fourth Amendment. 347 U.S. at 65-66. In *Walder*, law enforcement had unlawfully seized a capsule of heroin from the defendant's home, and the trial court had suppressed evidence of the capsule during an earlier prosecution. *Id.* at 62-64. At trial on new drug-related charges, the defendant affirmatively testified during direct examination that he had never possessed narcotics before, and he maintained that answer during cross-examination. *Id.* at 63-64. The trial court then permitted the prosecutor to call one of the officers who seized the capsule and the chemist who tested the capsule. *Id.* at 64. The court "carefully charged the jury that [that

evidence] was not to be used to determine whether the defendant had committed the crimes here charged, but solely for the purpose of impeaching the defendant's credibility." *Id.* The Supreme Court affirmed, reasoning that a defendant cannot "turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." *Id.* at 65.

[¶33] In the present case, the court properly analogized the circumstances it faced to cases where the Supreme Court permitted impeachment with evidence that would otherwise be suppressed or excluded when the defendant testified in direct contradiction to that evidence. *Cf. id.* ("[T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."). In other cases, without addressing the comparison to the impeachment exception to the exclusionary rule for Fourth Amendment violations, we have permitted impeachment with late-disclosed evidence. *See State v. Dechaine*, 572 A.2d 130, 135-36 (Me. 1990); *Mylon*, 462 A.2d at 1186.

[¶34] The trial court did not violate Poulin's right to a fair trial when it declined to permit him to use the State's violation of Rule 16 as a shield against the admission of probative evidence of guilt, were he to elicit testimony in conflict with that evidence. *See Landry*, 459 A.2d at 178 ("Although the State's breach

should not be held to the defendant's throat as a dagger, neither should it be used by him as a shield."); *cf. State v. Ifill*, 574 A.2d 889, 890-91 (Me. 1990) (concluding that the court did not abuse discretion in admitting previously excluded evidence to rebut suggestions in defense questioning that were inconsistent with the excluded evidence).

B.      Handwritten Notes

[¶35]  Poulin argues that his right to a fair trial was violated by the court's statement that it might admit some portion of the handwritten notes if Poulin elicited testimony that he and the victim had a "good relationship."  He argues that the notes would be inadmissible even if he had elicited such testimony and that the trial court's ruling caused him to change his trial strategy to his detriment.

[¶36]  Five of the seven notes at issue were not provided for our review. *See Kilton v. Kilton*, 2016 ME 63, ¶ 5, --- A.3d --- ("Having the burden of persuasion on appeal, [the appellant] is responsible for providing us with an adequate record . . . that is sufficient to permit fair consideration of the issues on appeal.").  The record suggests that the five missing notes contained handwritten statements documenting disputes between the author and Poulin.  The two notes that were provided to us include statements that "[D]erek" "pushed me," "blew smoke in my face," "was after me—saying I took his wallet[] + money," "grabbed me," "called me a [explicative]," and "wanted to spit on me."  One note indicates

that the author "slapped his face." The two dated notes were found next to the victim's purse on the kitchen table, and the five torn notes were found in the bedroom where the victim's body was located.

[¶37] The rule against hearsay, M.R. Evid. 802, makes inadmissible a statement made outside of court when it is offered "to prove the truth of the matter asserted in the statement," M.R. Evid. 801(c)(2). Further, evidence of prior bad acts is inadmissible to prove that a person acted in conformity with those prior acts. M.R. Evid. 404(b). A party "may attack [a] witness's credibility," M.R. Evid. 607, however, and a statement offered solely for the purpose of impeaching a witness, when accompanied by a limiting instruction, may be admitted at trial, *see* M.R. Evid. 404(b) ("Evidence of a crime, wrong, or other act is not admissible *to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character*." (emphasis added)), 801(c)(2) ("'Hearsay' means a statement that . . . [a] party offers in evidence *to prove the truth of the matter asserted in the statement*." (emphasis added)).

[¶38] Here, the court did not make an actual ruling that it would admit the notes if Poulin presented evidence that he had had a "good relationship" with the victim. Rather, although the court ruled as an initial matter that the notes were inadmissible hearsay, the court also stated that if Poulin attempted to demonstrate that he and the victim had a good relationship, the court would be willing to

reconsider that ruling. This was not an abuse of discretion. Indeed, the court's statement eliminated the possibility that Poulin would be surprised by the consequences of presenting evidence that *might* then allow the State to present the notes as proper impeachment or rebuttal evidence. The court did not violate Poulin's right to a fair trial by warning Poulin of this possibility.

C.    Conclusion

[¶39]  The trial court's evidentiary rulings did not deprive Poulin of a fair trial. Further, as the facts set out in this opinion demonstrate, there was ample evidence upon which the jury could find Poulin guilty beyond a reasonable doubt of each element of the crimes charged. *See* 17-A M.R.S. §§ 201(1)(A), (B), 802(1)(A).

The entry is:

Judgment affirmed.

---

**On the briefs:**

Amy L. Fairfield, Esq., Fairfield & Associates, P.A., Lyman, for appellant Derek S. Poulin

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Valerie A. Randall, Esq., Fairfield & Associates, P.A., Portland, for appellant Derek Poulin

Donald W. Macomber, Asst. Atty. Gen., for appellee State of Maine

York County Superior Court docket number CR-2012-2222
FOR CLERK REFERENCE ONLY