MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2023 ME 73
Docket:        And-22-310
Argued:        May 9, 2023
Decided:       November 30, 2023

Panel:         STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

GERMAINE PAGE

LAWRENCE, J.

[¶1]  Germaine Page appeals from a judgment of conviction entered by the trial court (Androscoggin County, *Stewart, J.*) for attempted murder (Class A), domestic violence criminal threatening with a dangerous weapon (Class C), domestic violence assault (Class D), domestic violence terrorizing (Class D), discharging a firearm near a dwelling (Class E), and domestic violence reckless conduct with a dangerous weapon (Class C).  Page contends that the trial court abused its discretion by imposing a discovery sanction, pursuant to M.R.U. Crim. P. 16(e), that, although it generally prohibited the State from using evidence that it had provided to the defense late, permitted the State to use any evidence that directly rebutted Page's evidence or that directly related to, further explained, or completed any of the late-provided evidence that Page

introduced. Page also asserts that the jury venire was not drawn from a fair cross-section of the community. We conclude that the trial court's discovery sanction constituted a fundamentally fair balance between the parties' competing interests. We do not reach Page's second contention because Page has not sufficiently preserved or presented a sufficient record for us to determine whether the jury venire was drawn from a fair cross-section of the community. We therefore affirm the judgment with respect to Page's contended errors. We, however, vacate the sentences with respect to domestic violence assault and domestic violence terrorizing because Page's sentences exceed the maximum sentences allowable under 17-A M.R.S. § 1604(1)(D) (2023).

## I. BACKGROUND

### A. Factual Background

[¶2] "Viewed in the light most favorable to the jury's verdict, the record supports the following facts." *State v. McLaughlin*, 2018 ME 97, ¶ 2, 189 A.3d 262. Germaine Page, who is African American, and the victim were previously in a romantic relationship and lived together in Auburn. At some point before June 2021, the victim told Page that she wished to end their relationship. The victim then traveled to North Carolina, where she spent time with another man.

Page learned of the nature of the victim's trip before the victim returned to Maine, and he then began to contact her nonstop.

[¶3]  On the evening of June 17, 2021, the victim returned to the apartment that she and Page shared to get her car keys.  Before the victim arrived, Page told his neighbors that the victim had been cheating on him while she was away, that he had a gun, and that he was going to "smoke her." Immediately upon the victim's arrival, Page accused the victim of cheating on him and followed her around the apartment while she looked for her keys. When the victim approached the apartment door, Page pushed and kicked her, which caused her to fall over a chair.  Page then put his foot on the victim's chest, pulled out a gun, aimed the gun at the victim's head, and told the victim that he was going to kill her.  Page pulled the trigger, but the gun misfired.

[¶4]  While Page attempted to unjam or reload the gun, the victim kicked Page off of her and again attempted to leave.  Page blocked the victim from leaving, struck her and knocked her to the floor, stomped on her face twice, and continued to try to fix the gun.  As the victim was standing back up, Page again pulled the trigger of the gun.  This time the gun went off, but the bullet missed the victim, lodged in the living room wall, and left a bullet hole.  Shortly after that, the victim escaped and fled toward a neighbor's apartment.

4

[¶5] The Auburn Police Department responded to multiple 9-1-1 calls made by neighbors, who called after hearing screaming and gun shots. The victim was transported to the hospital due to her physical injuries, bruising, and elevated heart rhythm. Page, who had fled on foot, was eventually found and taken into custody. Page disclosed to police officers that he had thrown the gun into a river after fleeing the apartment.

## B.   Procedural History

[¶6] On June 18, 2021, the State filed a criminal complaint against Page. On September 8, 2021, the State filed a six-count indictment charging the following offenses:

- Count 1: Attempted murder (Class A), 17-A M.R.S. §§ 152(1)(A), 201 (2021);

- Count 2: Domestic violence criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. §§ 209-A(1)(A), 1604(5)(A) (2021);

- Count 3: Domestic violence assault (Class D), 17-A M.R.S. § 207-A(1)(A) (2021);

- Count 4: Domestic violence terrorizing (Class D), 17-A M.R.S. § 210-B(1)(A) (2021);

- Count 5: Discharge of a firearm near a dwelling (Class E), 12 M.R.S. § 11209(1)(A), (2) (2021);[1] and

---

[1] We cite to the pre-October 2021 version of the statute establishing the firearm charge because 12 M.R.S. § 11209(1)(A) and (2) were recently amended, though the amendments are not relevant to this appeal. See P.L. 2021, ch. 74, § 2 (effective Oct. 18, 2021).

- Count 6: Domestic violence reckless conduct with a dangerous weapon (Class C), 17-A M.R.S. §§ 211-A(1)(A), 1604(5)(A) (2021).[2]

[¶7] On June 16, 2022, Page filed a demand for a speedy trial and a motion to dismiss. In his motion to dismiss, Page asserted that the State provided him with late discovery on June 15, 2022, which was only a few weeks from the jury trial docket call, even though the State had possession of the provided discovery for over a year. Page requested that the trial court either dismiss the indictment or prohibit the State from introducing any evidence contained in the discovery. On July 21, 2022, the trial court held a hearing on the motion to dismiss at which four officers from the Auburn Police Department testified. The officers testified that the State was late to share the discovery with the defense, that there was no good reason for the delay, and that the department has since implemented trainings and policies to prevent similar issues in the future. Page stated at the hearing that he did not want a continuance as a remedy, wanted to go forward with a trial, and was "not under any allusions [*sic*] that [the trial court was] going to dismiss this case."

---

[2] We cite to the 2021 version for the domestic violence charges (i.e., Counts 2, 3, 4, and 6) because 17-A M.R.S. §§ 207-A(1)(A), 209-A(1)(A), 210-B(1)(A), 211-A(1)(A) were recently amended, though the amendments are not relevant to this appeal. *See* P.L. 2021, ch. 647, §§ B-17, B-22, B-25, B-29 (effective Jan. 1, 2023).

6

[¶8]  On August 4, 2022, the trial court issued an order on Page's motion to dismiss in which it found that the State had provided "a less than satisfactory explanation why this discovery was not timely produced" and that there was "a history of late discovery production in the region."  The trial court determined that, pursuant to M.R.U. Crim. P. 16(e), "a meaningful sanction, short of dismissal, [was] warranted" and issued a discovery sanction that prohibited the State "from using in its case in chief any of the evidence and discovery produced to [Page] on June 15, 2022, except that said discovery may be used if it *directly* rebuts evidence presented or argument made by [Page]."  The trial court further ordered that Page could "use at trial evidence contained in the [late] discovery, but should he do so, the State may then offer additional evidence from the [late] discovery to the extent it directly relates to, further explains, or completes the evidence presented by [Page]."[3]

---

[3] On August 3, 2022, Page filed a second motion seeking further discovery sanctions after the State produced medical records of the victim's treatment following the June 17, 2021, incident.  The trial court denied Page's motion, reasoning that Page had notice that the victim sought medical treatment and that the State's delay was excusable because the medical records were under a different last name than the victim provided.  On August 15, 2022, Page filed a third motion for discovery sanctions after the State produced photographs of the victim's injuries just before jury selection was to take place.  The trial court ordered that these photographs were subject to the same sanction outlined in its August 4, 2022, order.

The trial court's discovery sanction was also brought up on the first two days of trial.  On the first day of trial, with respect to evidence about the victim urinating on herself during or shortly after the incident, the trial court clarified that witnesses are generally permitted to testify about their impressions, even if not contained within discovery material, but that an officer's representation of such impressions must be timely produced before trial.  The State subsequently elicited this

[¶9]  Jury selection took place on August 12, 2022, and the court held a jury trial on August 22-24, 2022.  The jury returned a guilty verdict on all six counts on August 24, 2022.  Page filed a motion for a new trial on August 30, 2022, *see* M.R.U. Crim. P. 33, which asserted, inter alia, that Page was unfairly prejudiced at trial by the State's late discovery, the trial court's discovery sanction unfairly prejudiced Page more than the State, the jury pool did not consist of a fair cross-section of the community, and the State had made "grossly disproportionate plea offers" in two cases with nearly identical fact patterns.

[¶10]  On September 21, 2022, the trial court held a hearing on Page's motion for a new trial and a sentencing hearing.  The trial court denied Page's motion for a new trial, reasoning that its discovery sanction "took a measured approach on suppressing [late discovery] evidence . . . and then leaving it to [Page] to make a decision whether to use it or not."  The trial court disagreed

---

testimony, without objection, from both the victim and a police officer.  On the second day of trial, Page raised a concern regarding a Florida warrant for the victim that was mentioned within a video produced in the State's late discovery but was not mentioned in the timely produced police reports.  Because Page indicated that he desired to use this warrant as evidence of the victim's state of mind during her interview with police officers, the trial court ruled that "the defense may use at trial evidence pertaining to the [late] discovery, but, should it do so, the State may then offer additional evidence from the [late] discovery to the extent that it directly relates to, further explains, or completes the evidence presented by the defense."  The trial court also clarified that, if Page brought up the warrant, the State could play only the clip of the video where the victim discusses the warrant so that the jury could see the victim's "demeanor and presentation."  Page brought up the warrant on the second day of trial while cross-examining the victim, and the State later elicited, with no objection, the additional testimony from the victim regarding the warrant.  No clips of the interview with the victim were admitted.

with Page's characterization that the discovery sanction "hamstrung the [d]efense" and reasoned that the order balanced the lack of time to review the discovery with the defense's desire to move forward with trial.

[¶11]  With respect to Page's argument regarding the jury not being comprised of a fair cross-section of the community, the trial court concluded that Page failed to meet his burden of establishing a prima facie case.  The trial court reasoned that, although it was attempting to collect race, ethnicity, and gender data from prospective jurors through a preliminary questionnaire, Page's failure to make appropriate motions before jury selection or objections during that process resulted in the court not being alerted of the need to compile data on the original composition of the jury.  Thus, that data was not available at the hearing on Page's motion for a new trial.  Because the court could not compare the jury venire's original composition to data on the racial makeup of Androscoggin County, it could not even begin to address the applicable standard, the absolute disparity test—the analysis used to assess whether the racial makeup of the jury venire passed constitutional muster. *See State v. Footman*, 2023 ME 52, ¶ 14, 300 A.3d 810.

[¶12]  The trial court sentenced Page to twenty-three years of confinement with all but thirteen years suspended and six years of probation

on Count 1. The trial court ordered that the sentences on the remaining counts were to run concurrently with Count 1 and sentenced Page to the following terms of imprisonment: five years on each of Counts 2 and 6, one year on each of Counts 3 and 4,[4] and six months on Count 5. Page timely appealed. *See* M.R. App. P. 2B(b)(2)(c).

## II. DISCUSSION

### A. Discovery Sanction

[¶13] Page argues that the trial court's discovery sanction effectively prevented him from presenting exculpatory evidence that was intermixed with the incriminating evidence contained in the State's late discovery production.[5] Because there is no dispute that the State failed to timely disclose certain

---

[4] Although the parties have not raised it, we note that Page's sentence of one year each for Counts 3 and 4 was impermissible because both convictions are for Class D crimes. *See* 17-A M.R.S. §§ 207-A(1)(A), 210-B(1)(A). "Unless a different maximum term of imprisonment is specified by statute, the maximum term of imprisonment is . . . [i]n the case of a Class D crime, *less than one year* . . . ." 17-A M.R.S. § 1604(1)(D) (2021) (emphasis added). We therefore vacate the sentence as to Counts 3 and 4 and remand for the trial court to correct Page's sentences to comply with section 1604(1)(D). *See State v. Anderson*, 409 A.2d 1290, 1304 (Me. 1979) (intervening on our own motion to consider a jury instruction issue not raised by the defendant); *State v. Collins*, 297 A.2d 620, 630 (Me. 1972) (explaining that we may "resolve[] a potential difficulty brought to light by our own examination of the record").

[5] Although Page appears to frame his argument as a constitutional violation, we construe Page's argument to be that the trial court abused its discretion in issuing its discovery sanction. Page has framed *all* his arguments on appeal as violations of the "due process and equal protection clauses of the United States and Maine [C]onstitutions." Page's brief, however, merely refers to these constitutional violations within short quotes from Supreme Court and First Circuit cases, and he only once cites to *some* of the constitutional provisions he alleges were violated in this case. Because Page has failed to develop his constitutional arguments, we deem them waived and do not address them. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11 & n.6, 905 A.2d 290.

discovery in this case, we need consider only whether the trial court erred in *the form* of its discovery sanction.

[¶14] "We review for an abuse of discretion a trial court's sanction for a discovery violation." *State v. Poulin*, 2016 ME 110, ¶ 28, 144 A.3d 574. Although "the trial judge has broad discretion in choosing the form of sanction to impose, if any at all," we have held that "[t]he trial court cannot . . . permit a discovery violation to deprive a defendant of a fair trial" that is required by the United States and Maine Constitutions. *Id.* ¶¶ 25, 27 (quotation marks omitted); *see generally* M.R.U. Crim. P. 16(e) ("If the attorney for the State fails to comply with [the Rule 16 discovery rules], the court . . . may take appropriate action, which may include, but is not limited to . . . granting the defendant additional time or a continuance . . . [or] prohibiting the attorney for the State from introducing specified evidence . . . ."). In our review, "[w]e look for a prejudicial effect on the defendant as a result of the discovery violation, as mitigated—or not—by the trial court's ruling." *Poulin*, 2016 ME 110, ¶ 28, 144 A.3d 574. "When a defendant contends that a discovery violation and the court's response to it violated his or her right to a fair trial, we review the trial court's procedural rulings to determine whether the process struck a balance between competing concerns that was fundamentally fair." *Id.* (quotation marks omitted).

[¶15]  In *State v. Poulin*, we affirmed the trial court's discovery sanction—which excluded evidence contained in late discovery from the State's case-in-chief but ruled that it would be otherwise admissible for impeachment purposes—because it "struck a balance between competing interests that was fundamentally fair."  *Id.* ¶ 29.  In that case, the State conceded that it had violated Rule 16's automatic discovery rules with respect to the GPS tracking data of the defendant and decided to not attempt to use that data in its case-in-chief.  *Id.* ¶¶ 16-18.  The State argued, however, that it should be allowed to introduce the GPS data to impeach witness testimony that would appear to contradict the GPS location of the defendant.  *Id.* ¶ 18.

[¶16]  In *Poulin*, we noted that the State's attorney did not withhold the GPS data in bad faith.  *Id*. ¶ 30 (explaining that a trial court may consider a State attorney's good faith while selecting a sanction).  We further reasoned that the trial court's discovery sanction did not deprive Poulin of a fair trial because "[t]he court had offered to continue the trial if Poulin requested so that Poulin could obtain an independent expert on the GPS data," and the discovery sanction "permitted Poulin to choose whether to present alibi evidence and defend against the contrary GPS data or avoid admission of the data altogether." *Id.* ¶ 31.  Finally, we agreed with the court's analogy to *Walder v. United States*,

347 U.S. 62, 65 (1954), which explained that, in some circumstances, illegally obtained evidence may be used for impeachment purposes, and we reasoned that "'the State's breach should not be held to the defendant's throat as a dagger, [but] neither should it be used by him as a shield.'" *Poulin*, 2016 ME 110, ¶¶ 32-34, 144 A.3d 574 (quoting *State v. Landry*, 459 A.2d 15, 178 (Me. 1983)).

[¶17]  Here, Page told the trial court that he did not wish to continue his trial because he wanted a speedy trial.  Therefore, the trial court, as did the trial court in *Poulin*, needed to balance the unfairness of the State's late discovery with the need to prevent Page from presenting a completely sanitized defense.[6] The trial court's discovery sanction balanced these competing interests in a manner that was nearly identical to the sanction that we approved in *Poulin*, and the trial court then consistently applied its discovery sanction throughout trial.  *See supra* n.2.  We therefore conclude that the trial court's discovery sanction struck a fundamentally fair balance between the parties' competing interests and that it did not abuse its discretion by crafting a sanction that limited the State's introduction of evidence contained in the late discovery while also preventing Page from presenting a completely sanitized defense.

---

[6] Notably, the trial court's consideration of the appropriate balance to strike is exemplified by its explanation to Page, on the second day of trial, that he couldn't "just cherry-pick and put [evidence] through completely sanitized.  That would be contrary to what the order said."

## B.     Fair Cross-Section of the Community

[¶18]   Page also argues that, because racial diversity in Androscoggin County has continued to increase, in large part because of a substantial increase in the "populations of Somalis, African-Americans, Latinos, Asians, and others," the jury venire should not have been "all white."[7]   As we have recently clarified, our review of a trial court's determination that the jury constituted a fair cross-section of the community is for clear error regarding the court's findings of facts and for an abuse of discretion regarding its ultimate legal conclusion. *State v. Footman,* 2023 ME 52, ¶ 10, 300 A.3d 810.   In addition, we have held that the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial[] by an impartial jury of the State and district wherein the crime shall have been committed."  *State v. Thomas*, 2022 ME 27, ¶ 27, 274 A.3d 356 (alteration in original) (quoting U.S. Const. amend. VI).   "[T]he jury venire must be drawn from a fair cross section of the community, but a fair cross section does not guarantee that juries be of any particular composition."  *State v. White*, 2022 ME 54, ¶ 16, 285 A.3d 262

---

[7] Page has not made any fair-cross-section arguments based on the Maine Constitution, aside from asserting in his motion for a new trial and in his appellate brief that the Maine Constitution provides "more specific" protections than the U.S. Constitution.  Page "has not engaged in an adequate analysis" of the Maine Constitution on appeal and has therefore waived such arguments.  *State v. Moore*, 2023 ME 18, ¶¶ 19-20, 290 A.3d 533; *c.f. State v. Armstrong*, 2019 ME 117, ¶ 23 n.6, 212 A.3d 856.  We therefore address only Page's arguments under the U.S. Constitution.

(quotation marks omitted). Rather, "[a]ll that is required is that the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* (quotation marks omitted).

[¶19] "To establish a prima facie claim that a jury selection process violates the constitutional requirement that the jury be selected from a pool representative of the community at large," we have adopted the three-part test set forth in *Duren v. Missouri*, 439 U.S. 357, 364 (1979). *State v. Holland*, 2009 ME 72, ¶ 23, 976 A.2d 227. For the challenging party to successfully assert that the "jury selection process . . . fail[ed] to include a fair cross-section of the community, the challenging party must show that (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in jury pools from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process." *White*, 2022 ME 54, ¶ 17, 285 A.3d 262 (quotation marks omitted).

[¶20] "Certain groups—such as those defined by race or sex—are unquestionably distinctive." *Footman*, 2023 ME 52, ¶ 13, 300 A.3d 810

(quotation marks omitted). Here, in the context of Page's argument, Black, African American, Indigenous, Latino, and Asian people clearly are distinctive groups, and the first element in the *Duren* test has been met.

[¶21] In considering the second element of the *Duren* test, "[w]e have adopted the absolute disparity test to determine whether the distinctive group at issue was underrepresented in venire panels." *Footman*, 2023 ME 52, ¶ 14, 300 A.3d 810 (quotation marks and footnote omitted). "The absolute disparity test measures the difference between the percentage of members of the distinctive group in the community and the percentage of group members on the jury wheel." *Id.* (quotation marks omitted). In this case, however, we cannot discern whether the jury venire was drawn from a fair cross-section of the community because the record has not been properly preserved or presented for our review. Page has failed to provide us with *any* evidence regarding the jury venire's racial and ethnic composition, and we cannot rely solely on his assertion that, based on his visual observation of the jury venire in this case, the jury was comprised entirely of White people. We likewise cannot rely on Page's unsubstantiated assertion, made in his motion for a new trial, that the racial and ethnic diversity of Androscoggin County has increased to a far greater degree proportionately than is represented in jury venires "that

16

are almost always exclusively white."  Moreover, as noted by the trial court, Page did not make a motion or objection regarding the composition of the jury venire during jury selection or at any time prior to his trial.  Rather, Page first asserted his contention in his motion for a new trial.  Thus, despite the trial court's collecting raw data on prospective jurors' race, ethnicity, and gender, Page's failure to raise this issue before or at jury selection led to the court not compiling the data, making it unavailable for comparison to data on the racial and ethnic makeup of Androscoggin County at the time of the hearing on Page's motion for a new trial.[8]

---

[8] We note that the composition of the jury venire is statutorily determined by 14 M.R.S. § 1252-A (2023) (providing that jury venire source lists be generated from the lists of licensed drivers, persons issued an identification card, and persons who notify their county clerk of their residence and request to be put on the source list, and that the source lists "may be supplemented with names from other lists specified by the Supreme Judicial Court").  Before we can consider whether, under the *Duren* framework, the process prescribed by section 1252-A for generating the jury venire list violates the constitutional guarantee to a jury venire drawn from a fair cross-section of the community, we would need to first be provided a sufficiently preserved record and analyzed statistical data.  *See Thomas v. Borg*, 159 F.3d 1147, 1150 (9th Cir. 1998) ("[T]he second prong of the *Duren* test requires proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community." (quotation marks omitted)).  The representation of the alleged excluded distinctive group(s) within a community may be ascertained through various means, not necessarily limited to census data.  *See, e.g.*, *United States v. Pion*, 25 F.3d 18, 22 (1st Cir. 1994) (census data); *United States v. Lucas*, No. 21-Cr-382, 2021 WL 4925715, at *2 (S.D.N.Y. Oct. 21, 2021) (American Community Survey data); *United States v. Miller*, 116 F.3d 641, 656, 658 (2d Cir. 1997) (explaining that census data can quickly become outdated and may "not accurately reflect the pool of qualified jurors"); *cf.* Stephen E. Reil, Comment, *Who Gets Counted? Jury List Representativeness for Hispanics in Areas with Growing Hispanic Populations Under* Duren v. Missouri, 2007 BYU L. Rev. 201, 214-240 (2007) (considering which population-based statistical considerations and analyses are appropriate under the second and third prongs of the *Duren* framework).  At a minimum, and without limitation, we would need to have the following data before us: the composition of the jury venire with respect to the alleged excluded distinctive group(s), the representation of the alleged excluded distinctive group(s) in the jury venire source lists, and the

[¶22]  We therefore do not reach this issue.[9]

### III.  CONCLUSION

[¶23]  We conclude that the trial court did not abuse its discretion in crafting its discovery sanction, which was fundamentally fair.  We do not reach Page's fair-cross-section claim because he has failed to provide us a properly preserved record with the data collection and statistical analysis necessary for our review under the *Duren* framework.  We therefore affirm the judgment with respect to Page's raised arguments on appeal.  However, because the trial court erred by entering a one-year sentence for Page's convictions on Counts 3 and 4, both Class D misdemeanors, *see supra* n.3, we vacate those sentences and

---

representation of the alleged excluded distinctive group(s) in the community.  *See White*, 2022 ME 54, ¶ 17, 285 A.3d 262 (quotation marks omitted).

9  Page also asserts that the State offered him a disproportionate plea offer when compared with the offer provided to the defendant in *State v. Every*, 2023 ME 39, 298 A.3d 806.  Page asserts that, because *Every* and his case are so factually similar, the contended disproportionate plea offer was, in part, attributable to Page being an African American man and Every being a White man.  The precise nature of Page's claim is not sufficiently developed, though it suggests a potential equal protection violation.  On this record, however, we cannot discern whether the contended disproportionate plea offers in these two cases is attributable to Page's race.  The record does not contain any suggestion that the State's higher plea offer was due, even in part, to Page's race.  Moreover, there are two alternative reasons for why the State's plea offer may have been higher for Page: (1) the State viewed its case against Page to be stronger, as exemplified by Every being acquitted of the State's attempted murder charge; and (2) according to the State, Every's original plea offer was reduced because of a judicial settlement conference.

remand to the court with direction to correct Page's sentences on those two charges to comply with 17-A M.R.S. § 1604(1)(D).

The entry is:

> Sentences as to Counts 3 and 4 vacated. Remanded for the court to correct the sentences consistent with this opinion. In all other respects, the judgment is affirmed.

---

James P. Howaniec, Esq. (orally), Lewiston, for appellant Germaine Page

Neil E. McLean Jr., District Attorney, and Katherine E. Bozeman, Dep. Dist. Atty. (orally), Prosecutorial District III, Lewiston, for appellee State of Maine

Androscoggin County Unified Criminal Docket docket number CR-2021-1203